No. 14-1535

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIRST CIRCUIT

_____

**NORMA IRIS MIRANDA-RIVERA; THE ESTATE OF CRISTOPHER ROJAS MIRANDA; NANCY I. TRINIDAD-TORRES**, on behalf of her minor child C.Y.R.T.
Plaintiffs - Appellants

GABRIEL ROJAS-PIRIS
Plaintiff

v.

**PEDRO TOLEDO-DAVILA**, Superintendent, Police of Puerto Rico;
**MIGUEL RODRIGUEZ-CRESPI**, Sergeant, Badge Number 8-11765;
**WILLIAM PEREZ-SOTO**, Police Officer, Badge Number 19273

Defendants - Appellees

ANIBAL ACEVEDO-VILA, Governor for the Commonwealth of Puerto Rico;
ROBERTO SANCHEZ-RAMOS, Secretary of Justice, Commonwealth of Puerto Rico;
ORLANDO RIVERA-LUGARDO; JUAN JOSE TOLEDO-BAYOUTH; JOSE TOLEDO-
BAYOUTH; FERNANDO TOLEDO-BAYOUTH; PEDRO J. TOLEDO-BAYOUTH;
JOHN DOE, Police Officer, Toa Baja; INSURANCE COMPANY ABC, INC.; RICHARD
ROE
Defendants

_____

### PLAINTIFFS/APPELLANTS' BRIEF

_____

**For Plaintiff/Appellants**
QUETGLAS LAW
PO Box 16606
San Juan PR, 00908-6606
Tel: (787) 722-0635/722-7745

JOSE F. QUETGLAS JORDAN
Ct. of Appeals Bar No. 14338
jfquetglas@gmail.com

PEDRO R. VAZQUEZ
Ct. of Appeals Bar No. 90552
prvazquez3@gmail.com

# <u>TABLE OF CONTENTS</u>

**Pages**

1.    Table of Authorities ....................................................................... ii

2.    Corporate Disclosure Statement ................................................. vii

3.    Statement of Jurisdiction  ............................................................ 1

4.    Statement of The Issues ............................................................... 1

**I.    WHETHER THE DISTRICT COURT ERRED IN EXCLUDING THE PLAINTIFFS' FORENSIC EXPERT REPORT**

**II.    WHETHER THE DECEDENT WAS SUBJECTED TO A DEPRIVATION OF CONSTITUTIONAL RIGHTS**

**III.    WHETHER THE PRPD SUPERINTENDENT CAN BE HELD LIABLE FOR THE CONDUCT OF HIS SUBORDINATE POLICE OFFICERS**

**IV.    WHETHER THE DECEDENT'S RIGHTS WERE CLEARLY ESTABLISHED WHERE A REASONABLE PERSON SHOULD HAVE KNOWN THAT SUCH CONDUCT VIOLATED HIS RIGHTS.**

5.    Statement of the Case ................................................................... 1

6.    Statement of Facts............................................................................ 3

7.    District Court Decision  ...............................................................14

8.    Summary of the Argument  ......................................................... 18

9.    Standard of Review .......................................................................20

10.    Argument ..................................................................................... 22

10.    Conclusion ……………………………………………………...56

i

# <u>TABLE OF AUTHORITIES</u>

## I. CASES                                                          Pages

### A.  US SUPREME COURT

*Anderson v. Creighton*, 483 U.S. 635 (1987) ………….... 50-52

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)…………22

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)……………………….. 47

*Board of Regents v. Roth,* 408 U.S. 564, 569-70 (1972)……….32

*Brosseau v. Haugen*, 543 U.S. 194, 195 (2004)………………. 52

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)…………………21

*City of Canton v. Harris,* 489 U.S. 378 (U.S. 1989)……………47

*City of Revere v. Massachusetts General Hospital,*
463 U.S. 239, 244 (1983)………………………………………33

*Collins v. City of Harker Heights,* 503 U.S. 115 (1992)………. 45

*County of Sacramento v. Lewis,*
523 U.S. 833, 847 (1998)……………………………………… 45

*Daubert v. Merrill-Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ……………………………18, 20, 27, 28, 31

*DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.,*
489 U.S. 189 (1989)…………………………………………… 41

*Farmer v. Brennan,* 511 U.S. 825, 837 (U.S. 1994)……………33

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ……………………………………… 20, 28

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136 (1997) …………………20

**Pages**

*Graham v. Connor*, 490 U.S. 386, 394 (1989)……………… 42, 53

*Harlow v. Fitzgerald*,
457 US 800 (1982) ......................................................................50

*Pearson v. Callahan*, 129 S. Ct. 808 (2009)…………………… 51

*Plumhoff v. Rickard*, ** U.S. **,
134 S. Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014)………………..42

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)…………………………………………… 22

*Rochin v. California,* 342 U.S. 165, 172-173 (1952)………….. 45

*Tennessee v. Garner*, 471 U.S. 1 (1985)……………………….. 53

*United States v. Lanier*, 520 U.S. 259 (1997)………………...51

**B. FIRST CIRCUIT**

*Aponte Matos v. Toledo Davila,*
135 F.3d 182, 191 (1st Cir. 1998)………………………………… 45

*Camilo-Robles v. Hoyos,*
151 F.3d 1, 8 (1st Cir. 1998) …………………………………31, 46

*Cortes-Quinones v. Jimenez-Nettleship,*
842 F.2d 556 (1st Cir. 1988)……………………………………….33

*DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir. 1991). ………..34

*D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co.,*
640 F.3d 27 (1st Cir.2011)……………………………………..21

*Gaudreault v. Salem,* 923 F.2d 203 (1st Cir. 1990)……........33, 38

**Pages**

*Gutierrez-Rodriguez v. Cartagena*,
882 F.2d 553, 561 (1st Cir. 1989)……………………………………47

*Hayes v. Douglas Dynamics, Inc.*,
8 F.3d 88 (1st Cir. 1993)……………………………………………29

*Jennings v. Jones,* 499 F.3d 2 (1st Cir. 2007)……… 42, 45, 54, 56

*Leavitt v. Corr. Med. Servs.*,
645 F.3d 484 (1st Cir. 2011)………………………………... 41

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004)……………….. 51

*Maldonado v. Fontanes*,
568 F.3d 263 (1st Cir. 2009) ………………………………… …. 51

*Maldonado Santiago v. Velazquez Garcia*,
821 F.2d 822, 831 (1st Cir. 1987)………………………………32

*Montes v. Ponce Municipality*,
79 Fed. Appx. 448, 450 (1st Cir. 2003)…………………………33

*Poulis-Minott v. Smith*, 388 F.3d 354 (1st Cir. 2004)……….21, 52

*Ramirez-Lluveras v. Rivera-Merced*,
759 F.3d 10, 19 (1st Cir. 2014)………………………………… 47

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
161 F.3d 77 (1st Cir. 1998)………………………………27, 28, 31

*Schubert v. Nissan Motor Corp. in U.S.A.*,
148 F.3d 25 (1st Cir.1998) ……………………………………… 21

*Sch. Union No. 37 v. United Nat'l Ins. Co.*,
617 F.3d 554 (1st Cir.2010)……………………………………21

*Smith v. Dorchester Real Estate, Inc.*,
732 F.3d 51 (1st Cir. 2013)…………………………………..20

**Pages**

*Springer v. Seaman*, 821 F.2d 871, 876 (1st Cir. 1987)…............55

*Suboh v. Dist. Attorney's Office of Suffolk*,
298 F.3d 81, 93 (1st Cir. 2002)………………………………….51

*Surprenant v. Rivas*,
424 F. 3d 5 (1st Cir. 2005) ..……………………………………… 50

*Torraco v. Maloney,* 923 F.2d 231 (1st Cir. 1991)…………...33, 54

*United States, et. al. v. Brigham and Women's Hospital*;
678 F.3d 72 (1st Cir.2012) ……………………………….…20, 30

*United States v. Diaz,* 300 F.3d 66 (1st Cir. 2002)……………   27

*United States v. Vargas,* 471 F.3d 255, 265 (1st Cir. 2006)…… .28

*Whitefield v. Melendez-Rivera*,
431 F.3d 1 (1st Cir. 2005)……. …………………………..47, 55

**B.  SIXTH CIRCUIT**

*Border v. Trumbull County Bd. of Comm'rs*,
414 Fed. Appx. 831 (6th Cir. 2011)…………………………38-39

**C.  SEVENTH CIRCUIT**

*Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013)………. 53

*Gayton v. McCoy*, 593
F.3d 610 (7th Cir. 2010) .......................................................28, 29

**D. TENTH CIRCUIT**

*Sutton v. Utah State Sch. for the Deaf & Blind*,
173 F.3d 1226, 1241 (10th Cir. 1999)………………………… 52

**Pages**

### E. DISTRICT COURTS

*Barbosa v. Conlon,*
2013 U.S. Dist. LEXIS 81202 (D. Mass. 2013)………………… 34

*Bradway v. Town of Southampton,*
826 F. Supp. 2d 458 (E.D.N.Y. 2011)……………………………39

*Estate of Lawson v. City of Hamilton,*
2009 U.S. Dist. LEXIS 43391 (S.D. Ohio 2009) ……………….. 39

*Moreau v. Gerardi,*
2010 U.S. Dist. LEXIS 124613 (D.Mass. 2010)…………………54

*Rodriguez-Vazquez v. Cintron-Rodriguez,*
160 F. Supp. 2d 204, 209-210 (D.P.R. 2001)……………………..32

## II. STATUTES

28 U.S.C. § 1291 ….............................................................................  1

42 U.S.C. § 1983.....................................................31, 32, 46-47, 50, 55

U.S. Const. Amend. IV .........................................2, 14, 18, 42, 45, 50, 52-54

U.S. Const. Amend. XI ............................................................... 14

U.S. Const. Amend. XIV...............................2, 14-15, 32, 41, 45, 50, 53-54

## III. RULES

Fed. R. App. P. 4 ............................................................................ 1

Fed. R. Civ. P. 26 ........................................................................... 5

Fed. R. Civ. P. 56 ........................................................................... 21

Fed. R. Evid. 702...........................................................................  27

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Appellants' Counsels advise that the Plaintiffs are not a corporate party; they are private citizens.

## STATEMENT OF JURISDICTION

A District Court's judgment in a civil case is a final order subject to appeal under 28 U.S.C. § 1291.  Fed. R. App. P. 4 requires that a notice of appeal in a civil case be filed with the District Court within 30 days after the entry of the judgment or order appealed from.  On March 31, 2014, the District Court entered Judgment; and, on April 28, 2014, Plaintiffs-Appellants filed with the District Court their notice of appeal. Docket Nos. 200-201; Joint Appendix[1] ("JA") 816-817.

## STATEMENT OF THE ISSUES

I.     **WHETHER THE DISTRICT COURT ERRED IN EXCLUDING THE PLAINTIFFS' FORENSIC EXPERT REPORT**

II.    **WHETHER THE DECEDENT WAS SUBJECTED TO A DEPRIVATION OF CONSTITUTIONAL RIGHTS**

III.   **WHETHER THE PRPD SUPERINTENDENT CAN BE HELD LIABLE FOR THE CONDUCT OF HIS SUBORDINATE POLICE OFFICERS**

IV.    **WHETHER THE DECEDENT'S RIGHTS WERE CLEARLY ESTABLISHED WHERE A REASONABLE PERSON SHOULD HAVE KNOWN THAT SUCH CONDUCT VIOLATED HIS RIGHTS.**

## STATEMENT OF THE CASE

The Complaint in this civil rights case stems from the use of excessive force by officers of the Puerto Rico Police Department ("PRPD") that caused the

---

[1] The bate-stamp numbering of the JA is located in the upper left hand corner of each page.

wrongful death of Christopher Rojas Miranda ("Rojas") and was brought by Rojas' only son and legal heir, the minor Plaintiff CYT -- appearing through his legal guardian and mother, Nancy I. Trinidad Torres ("Trinidad") --, on his own and on behalf of the Rojas Estate, under the Fourth and Fourteenth Amendments. The Complaint also included pendent claims brought by Rojas' mother, Plaintiff Norma Miranda, on her own and on behalf of the minor Plaintiff JLM, who is the brother of the decedent, pursuant to Puerto Rico's general tort statute.

In the evening of April 10, 2007, Defendant police officers William Perez ("Perez") and Orlando Rivera ("Rivera") spotted Rojas driving at a high speed, running stoplights and swerving. The officers in the patrol car chased Rojas until he stopped the car on the side of the road. During the intervention the deputies observed that Rojas' face was extremely pale and turning purplish; his lips were black; his eyes were wildly opened; and the veins in his temples were bulging. Both deputies perceived that Rojas was delusional, disoriented and shouting incoherently. While the two officers effectuated the arrest, there was a brief scuffle between them and Rojas, where all three went to the ground and Rojas landed on his stomach on the road. Perez and Rivera then handcuffed Rojas. Rojas was unharmed. An eyewitness that saw Rojas handcuffed at the scene could only observe on Rojas a small cut in his lips. Sergeant Miguel Rodriguez ("Rodriguez") arrived at the scene and, upon seeing Rojas' diminished mental

capacity, ordered for Rojas to be immediately taken to a medical facility. However, the Sergeant allowed his subordinates to make a medical judgment call and override his order. Instead, Perez and Rivera with the blessing of the Sergeant, took Rojas to the police station and placed him, fully restrained, in a holding cell.

From the precinct, the desk officer called the paramedics and shortly thereafter they arrived, pronouncing Rojas dead in the holding cell. The homicide investigator who examined the scene wrote in his report that the corpse exhibited visible signs of violence, such as: lacerations on the lower left part of the back, both knees and the right eyebrow; injuries in the area of the chin and left eyebrow; and, marks on the wrists. The findings and the photographs of the autopsy were remarkable for extensive traumas throughout the whole body.

Inexplicably, the District Court summarily dismissed the Complaint. This request for a reversal follows.

## **STATEMENT OF FACTS**

### A.   PROCEDURAL HISTORY

1.   The Complaint was filed on April 9, 2008. Docket No. 1.

2.   On July 13, 2009, all parties filed their Initial Scheduling Conference Memorandums. Docket Nos. 23-25.

3

3.      The Complaint was amended on October 7, 2009.  The Defendants to the action were: Police Chief Pedro Toledo ("Toledo"), Sgt. Rodriguez, Officer Perez and Officer Rivera.  Docket No. 32.

4.      On July 2, 2010, Plaintiffs moved for default against Rivera, which the Court granted on October 18, 2010.  Docket Nos. 73 & 90-91.

5.      Early in the proceedings it surfaced that Rojas had a child out of wedlock, who had not been recognized by him, nor registered with pertinent State agencies.  On November 4, 2010, Defendants filed a motion to dismiss, given that the unrecognized minor was probably the correct party in interest.  Docket No. 93.

6.      On April 20, 2011, the District Court dismissed the Complaint without prejudice until the Commonwealth Court resolved the issue of the minor's legitimacy.  Docket No. 107.

7.      Once the issue of the parentage of the minor child was solved, Plaintiffs filed a Second Amended Complaint; answered thereafter by Defendants. JA 27-40, 41-62.

8.      On July 30, 2013, Defendants filed a motion for summary judgment. JA 63-96, 97-182 & 183-282.

9.      On September 9, 2013, Plaintiffs moved in *limine* to strike forensic psychiatrist Raul Lopez as an expert witness for Defendants, as well as the new opinions rendered by their expert in forensic pathology, Dr. Edda Luz-Rodriguez,

in a declaration under penalty of perjury. JA 283-293. Plaintiffs therein argued that neither of their reports complied with Fed. R. Civ. P. 26, given that in their ISC memo's Defendants did not include a designation of experts. Defendants had later designated Dr. Rodriguez, the same pathologist that conducted the autopsy, as an expert; but no report was ever produced during the discovery process. Instead, Rodriguez rewrote her forensic report in a statement prepared for summary judgment purposes after the closure of discovery. Defendants had provided Dr. Lopez's report to Plaintiffs after business hours on Friday December 28, 2012, when the discovery cut-off was Monday, December 31, 2012. Moreover, this report did not include the expert's qualifications, a list of all other cases in which, during the previous 4 years, he testified as an expert at trial or by deposition, nor a statement of the compensation to be paid for the study and testimony in this case, as required by Fed. R. Civ. P. 26 (a)(2)(B)(iv), (v) & (vi). JA 283-293.

10. On September 20, 2013, Plaintiffs opposed Defendants' motion for summary judgment. JA 294-488; 529-568.

11. On September 23, 2013, Defendants opposed Plaintiffs' in *limine* motion, claiming that Dr. Rodriguez was never offered as an expert witness, but rather as a percipient expert and, thus, was not bound by the requirement of submitting a FRCP 26 expert report. JA 489-506.

12.     On September 27, 2013, Plaintiffs' replied to Defendants' response to the motion *in limine*, underscoring that Defendants had acquiesced to the fact that the submissions of both experts were untimely and advanced no explanation to justify such prejudicial delay.   JA 510 & 520-521.   Moreover, at all times, Defendants had designated Dr. Rodriguez as an expert witness.   *See, id.* (Defendants' September 21, 2009 Disclosure of Expert Witness).

13.     On October 7, 2013, Defendants supplemented their opposition to Plaintiffs' motion in *limine*.  JA 522-528.

14.     On November 5, 2013, Defendants filed a reply to Plaintiffs' opposition to the summary judgment motion.  JA 569-625.

15.     On November 15, 2013, Plaintiffs filed a Surreply thereto.  JA 626-664.

16.     On December 12, 2013, Defendants replied to the Surreply.  JA 665-671.

17.     On February 20, 2014, Plaintiffs' motion in *limine* was denied.  JA 672-675.   The Magistrate Judge opined that Dr. Rodriguez was a percipient witness and allowed her re-written report, as well as the untimely opinions of Dr. Lopez, into the record.  *Id.*

18.    On March 7, 2014, the Magistrate Judge issued a Report and Recommendation ("R&R"), granting, in part, and denying, in part, the summary judgment request.  JA 676-711.

19.    On March 14, 2014, objections to the R&R were filed by Defendants (JA 712-730) and by Plaintiffs (JA 731-743).

20.    On March 26, 2016, Plaintiffs filed a response to Defendants' objections to the R&R.  JA 744-774.

21.    On March 31, 2014, the District Court issued its Opinion and Order granting summary judgment; and entered judgment accordingly.  JA 775-816.

22.    On April 28, 2014, Plaintiffs filed a Notice of Appeal.  JA 817.

## B.    PLAINTIFFS' SUBSTANTIVE ALLEGATIONS

### 1.    The Decedent Rojas.

Rojas was 27 years old when he died on April 10, 2007.  He was pursuing a college education -- as time and resources allowed him -- and receiving outstanding academic marks, with a 3.75 grade point average.  He worked in car sales/advertisement.  He umpired baseball games and reached the height of playing double AA baseball.  In 2003, Rojas began dating Trinidad and, eventually, they moved in together.  In 2006, the couple had a child, minor Plaintiff CYRT.  JA 356.  Rojas, over the last year before his death, used cocaine, perhaps, twice a week.  Trinidad testified that while high, Rojas became nervous with a sense of

persecution and drove improperly; however, he was not violent. JA 357 & 374-377.

**2.      April 10, 2007: The PRPD's Intervention with Rojas.**

On April 10, 2007, Trinidad first saw Rojas when she returned home from work at about 6:00 p.m., and he appeared to be "high."  Rojas then went to take a shower.  When Trinidad next saw Rojas about 45 minutes later, he seemed okay. "[H]e had already gotten over it."  JA 357 & 381.  Before Trinidad served him dinner, sometime between 7:00 to 7:30 p.m., Rojas stepped out of his house to buy refreshments.  JA 357 & 380-381.

At approximately 8:15 p.m., while on preventive patrol, police officers Perez and Rivera first spotted Rojas driving at a high speed, running stoplights and swerving; and they chased him.  Suddenly, Rojas brought his car to a halt in the area of State Road No. 2.  JA 357, 99 & 190-195.  Both police officers got out of the patrol car.  Deputy Perez proceeded to approach Rojas' vehicle and noted that Rojas had maintained his hands on the steering wheel.  Perez described Rojas as sweaty, nervous and glancing in every direction.  Rojas was instructed to shut the car's engine off and drop the keys outside of the car, to step out of the car and move towards the rear of the car, and to place his hands on his car's trunk.  Rojas obeyed Perez's commands.  JA 358, 196-197, 100 & 639.

Perez asked Rojas if he was alright or had a problem or an emergency, and offered to provide assistance.  Rojas did not answer and maintained his hands on top of the trunk of the car.  Perez, again, inquired with Rojas regarding his condition.  However, Rojas would not respond.  Rojas then started looking in a fixed manner towards State Road No. 2.  Precipitously, he started screaming, "Why is that vehicle following me, why is it following me!"  JA 358, 198, 585 & 639-640.  Perez described Rojas at that moment as if he had exploded.  He saw Rojas was wild-eyed and the veins in his temple region were bulging.  Rojas kept saying that he was being followed and that someone was trying to kill him, with his gaze fixed on Highway No. 2.  JA 358-359, 198 & 641-642.  Up to this point in time, Perez described Rojas as agitated, more than anything else.  Rojas stayed where he was and did not lift his hands from the trunk of the car.  JA 359, 586 & 199.

Shortly thereafter, Rojas began yelling foul language.  Perez was not sure to whom Rojas was directing the foul language.  Rojas was also "screaming louder." JA 359, 201-203, 586-587 & 643-646.  Perez kept asking Rojas if he was alright or whether he had any problem.  Rojas did not answer him and simply kept repeating "…*they are going to kill me, they are following me… .*"  JA 360, 198, 206 & 587. At this point in time, officer Perez made a judgment call to restrain Rojas, and reached for his handcuffs.  Suddenly, Rojas gyrated and impacted officer Rivera's

9

portable radio, knocking it out his hands. However, Perez testified that this incident was not intentional. JA 359, 204, 587 & 652.

A scuffle ensued between the two officers and Rojas. All three went to the ground and Rojas hit the ground with his chest or stomach. On the ground, the officers restrained and handcuffed Rojas. Perez testified that by that time, Rojas had no injuries or bruises on him. JA 360, 209-210, 215-217, 229, 588 & 652. Likewise, Sergeant Rodriguez, who arrived at the scene where Rojas had been detained, saw that by the time he was handcuffed and in custody Rojas had no injuries or bruises on him. JA 360, 588 & 655-656. Eyewitness Jose Candelaria, a civilian who witnessed the whole incident at the scene, corroborated that Rojas was unharmed, stating that he only observed a "small cut" in Rojas' lip. JA 118.

### 3.    Failure to Provide Medical Treatment.

Officer Rivera observed that "[Rojas'] face appeared extremely pale and his lips were very black." JA 281. Likewise, officer Perez saw that Rojas was "extremely sweaty, disoriented and had a purplish coloring in his forehead features, temple and cheeks and skin;" and Rojas' "eyes were pronounced." JA 361 & 564. Rojas was out of himself and "shout[ing] incoherently." *Id.,* & 540. Rivera also described Rojas as "aggressive, anxious and incoherent in his expressions." JA 361 & 281. Eyewitness Jose Candelaria also observed Rojas at the scene "acting in an incoherent and aggressive manner" and corroborated that

"his face was purplish.  JA 118.  Officer Perez could not determine to whom Rojas was directing his rant and hostility.  Rojas would simply not respond to any of Perez's inquiries.  Rojas kept up the frenzy that he was being followed and someone wanted to kill him, looking nervously in every direction. JA 361, 201-203, 535-541 & 643-645.  When Sergeant Rodriguez arrived at the scene, Rojas was already handcuffed and in the patrol car, screaming foul language and yelling that he was being followed and that he was going to be murdered.  Rodriguez looked inside the patrol vehicle; he saw that Rojas was sweating and perceived that his verbal expressions were incoherent.  JA 361, 246-247 & 662.  In view of the behavior displayed by Rojas, Sgt. Rodriguez instructed Rivera and Perez at the scene to take Rojas to a medical facility.  JA 360 & 662.  However, the Sergeant allowed the officers to make a medical judgment call and override his order to take Rojas to a medical facility.  Instead, Rojas was taken to the police station.  JA 361-362 & 248-249.

### 4.     The Death of Rojas.

Officers Perez and Rivera transported Rojas to the police station, followed by Sgt. Rodriguez.  JA 362, 230 & 647.  Once in the precinct, Sgt. Rodriguez ordered all of the other officers out of the station, remaining only the three defendants and a desk attendant.  JA 362 & 658.  Rojas was placed in a holding cell, face down on the ground, cuffed at the wrists behind his back and was then

also tied at the ankles. Essentially, Rojas was fully restrained and was left there alone. JA 362 & 227. Sgt. Rodriguez and officers Perez and Rivera were the last persons to see Rojas alive. The next persons that saw Rojas were paramedics, who found his lifeless body in the holding cell and reported that he had no vital signs at 9:50 p.m. JA 362, 236 & 554.

Protocol requires that the District Attorney's Office, the Forensic Science Institute ("FSI") and the PRPD Homicide Division be contacted in such cases. Upon being contacted, officials from these agencies arrived at the police station, immediately took charge of the scene and interviewed Perez and Rodriguez. JA 363, 237, 549 & 592. PRPD Homicide Officer Braulio Gonzalez's April 10, 2007 "Incident Report" provided as follows:

> As a sign of violence [the decedent] had a laceration in the lower left part of his back. His right eyebrow had a laceration and an injury in the area of the chin. He had marks on his wrists and both knees were lacerated and he had a small cut on his left eyebrow.

JA 363 & 553. Photographs taken by the FSI demonstrated that Rojas exhibited multiple contusions, abrasions and lacerations throughout his body surface. JA 363 & 442-455.

### 5.    The Cause of Death

Dr. Edda Rodríguez was the Commonwealth Forensic Pathologist who conducted the decedent's autopsy and prepared the Forensic Medical Report. She

concluded that the "cause of death [was] body trauma and cocaine intoxication;" and that the "manner of death" was an "accident."  JA 368 & 264.

An expert consultant in anatomic pathology and forensic pathology, Dr. Adele Shaker, reviewed Rojas' case file.  On basis of his twenty-five plus years of experience, training, education and knowledge in forensic pathology, Dr. Shaker rendered a report in this case.  JA 366 & 456-463.  Dr. Shaker noted in his expert witness report that there was evidence of blunt force trauma to the head, face, trunk and extremities.   Dr. Shaker concluded that such bodily injuries were not accidental and that Rojas died from extensive blunt force trauma to the head and trunk.  JA 367-368 & 461-462.  Regarding the cocaine as cause of death, Dr. Shaker concluded that the autopsy report contained a series of fallacies.  For example, the half-life of Cocaine is thirty to ninety minutes and the parent drug could not be found in the blood analysis after that time.  Cocaine also continues to be metabolized even after death.  If Rojas died several hours after snorting the Cocaine and in the police custody, his blood would not have revealed the parent drug Cocaine, but only its metabolites.   The validity and credibility of the toxicological analysis is thus, questionable.  JA 368 & 461-462.

## C.   DISTRICT COURT'S OPINION & ORDER

### 1.   Official Capacity and Probable Cause Stop.

The District Court dismissed the claim under the guises of the Eleventh Amendment for relief against the individuals in their official capacities; and, the Fourth Amendment claim for seizure without probable cause.   JA 788-792. Plaintiffs are <u>not</u> challenging these two rulings.

### 2.   Excessive Force.

As the District Court found, it is uncontested that at the time of the initial arrest the police officer Defendants did not use excessive force.  Plaintiffs' claim of the use of excessive force originates once Rojas was transported in patrol car and taken to the Toa Baja Police Precinct.  JA 792-793.  The District Court then considered whether the correct Constitutional doctrine for a claim of excessive force against a detained citizen stemmed from the Fourth or the Fourteenth Amendment, addressing the split among the Circuits.  The Court determined that the correct source of such a claim was the Fourth Amendment and analyzed the instant excessive force claim under an "objectively reasonable" standard.  JA 794-796.

The District Court then described Defendants' factual rendition of the process of getting Rojas into the cell, where he was apparently resisting by putting his feet on the edges of the doorway and preventing the police from entering him

14

into a cell[2] and later through kicks. "[T]the decedent was aggressive and screaming, doing everything within his power to avoid being locked in the holding cell. It was only after Rojas-Miranda began kicking that the arresting officers used force to not only protect themselves but to restrain him. The Court stresses that the use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." JA 800. The Court concluded that the officers used sufficient force to restrain Rojas once he arrived at the precinct. *Id.*

### 3. The Forensic Expert Witness Report of Adel Shaker.

The District Court opined that "Dr. Shaker's report does not provide a factual basis for his opinion nor does it discuss or consider any other potential hypothesis. In essence, what Dr. Shaker did was summarize all of the decedent's injuries and then jump straight to his conclusion that said injuries were non-accidental." JA 802.

### 4. Fourteenth Amendment: Denial of Medical Care.

In the factual analysis, the District Court stated that the following were uncontested facts:

---

[2] In footnotes 10 and 11 (JA 799), the District Court stated that Plaintiffs objected to these paragraphs without any support to the record. That is not correct. Plaintiffs objected to Defendants' interpretation of the cited exhibit to the effect that Rojas became violent. What the referenced exhibit states is that Rojas placed his feet at the edge of the doorway. Nor did the description use the word "violent." *See,* JA 105 ¶ 55; 225.

> Sgt. Rodríguez [] told the agents that seeing that this person was so violent they could take him to the CDT.[3] Rivera [] told Sgt. Rodríguez [] that given how violent and aggressive the individual was and his size, an incident could be provoked at the CDT where other people could be put at risk. He then said that the more viable alternative was to take him to the police station. Sgt. Rodríguez [] agreed with Rivera [] because a problem could be prevented at the CDT. Both Pérez [] and Rivera [] got in the patrol car and drove to the Toa Baja police station.

JA 798-799 (references to the record omitted). Plaintiffs submit that those so-called uncontested facts are in controversy. Plaintiffs admitted that such were the statements given by officer Rivera in his affidavit and Sgt. Rodriguez in his deposition, with the qualification that such statements were self-serving, nonsensical and irrational, evidently elaborated to cover up their deliberate indifference to the urgent medical needs of Rojas. JA 326-327. In fact, Sgt. Rodriguez omitted such exchange in his contemporaneous sworn statement, wherein he simply stated that "[he] told the agents to go by the DTC [or CDT, in Spanish], and they proceeded to carry the detainee to the Toa Baja precinct." JA 558. As such, such statements present an issue of credibility that should be decided by a jury. JA 326-327.

The District Court found that the "after falling down and being placed under arrest, the decedent acknowledged to Officer Pérez that he was fine. Nevertheless, Rojas [] continued to behave in a belligerent and delusional manner, stressing that

---

[3] "CDT" is the acronym in Spanish for Center for Diagnostics and Treatment; referred to in English as Diagnostics and Treatment Center ("DTC" for its English acronym).

16

people were following him." JA 805. At "8:40 PM ... the arresting officers called dispatch for assistance." *Id.* Although upon arriving at the scene Sgt. Rodriguez "suggested that the decedent be transported to an urgent care facility to get treated for the injuries sustained from the fall," "Officer Rivera recommended that the decedent be transported to the police station instead, ... given [Rojas'] violent state[,]" and "Sgt. Rodríguez [] agreed." *Id.* At 9:38 PM, the police desk officer placed a call to the paramedics requesting medical assistance for the decedent. "According to Defendant Pérez, the decedent's temple and front part of the head started turning purplish." *Id.* "The paramedics arrived at the station at 9:48 PM" and Rojas was pronounced dead. *Id.* The District Court found that there was "not a scintilla of evidence on the record showing 'deliberate indifference' on behalf of the Defendants."

> The police officers made a judgment call to transport the decedent back to the police station and provide him with medical treatment there as opposed to taking him to an urgent care center. The physical and *medical evidence* demonstrates that the decedent was more likely than not under the influence of narcotics at the time of his arrest, thereby explaining his aggressive and irrational behavior… . Additionally, and of the outmost importance, is the fact that the decedent had traces of both the mother substance of cocaine and its principle metabolite (benzoleicgonine) in his blood stream at the time of his death.

JA 806-807. In footnote 13, the Court relied on conclusions of Dr. Edda Rodríguez and held that the decedent's cause of death was cocaine intoxication. The Court alluded to a witness at the scene of the intervention and concluded that

the decedent did not have a medical need so obvious that even a lay
person would easily recognize the need for medical attention. José []
Candelaria [], an eyewitness to the stop and the arrest, acknowledged
that the only injury he could observe on the decedent was a small cut
in his lips.

JA 803-807.

### 5.   Qualified Immunity.

The District Court concluded that Defendants used only the necessary force
to control the decedent from the time of his arrest to when he passed away, slightly
over an hour after the arrest, and granted immunity on Plaintiff's Fourth
Amendment excessive use of force claim. In turn, in footnote 15, the Court opined
that Defendants could also be entitled to qualified immunity on the grounds that
the decedent's Constitutional rights were not clearly established, given that there
were unanswered questions regarding what level of protection is accorded to
individuals who have been arrested but are not yet pretrial detainees. JA 808-813.
However, Plaintiffs point out that Defendants did not raise that issue in their
memorandum of law. JA 63-96.

## SUMMARY OF  THE ARGUMENT

First, the District Court's evidentiary ruling, disregarding Plaintiffs' forensic
expert report as not meeting the requirements of admissibility, does not comport
with *Daubert* criteria. The District Court clearly abandoned its role as gatekeeper

and became an armed guard.  Simply put, the credibility of the expert had to be contested in cross-examination before a jury.

Second, the District Court's analysis of the weight of the evidence to the point of stating that there was no evidence or minor indicia of physical violence ignored the investigative report of the homicide detective who described the contrary, the photographs of the autopsy that were remarkable for physical violence and even the pathologist's unexplained findings of bodily trauma in the original autopsy report.

Third, Lou Reiter, an expert witness on police practices, noted that all police officers at the scene observed Rojas' diminished mental capacity and the symptoms he was exhibiting.  Instead of immediately taking Rojas to a medical facility, as Sgt. Rodriguez initially ordered, officers Rivera and Perez took him to the police station and placed him fully restrained in a holding cell, where Rojas died as result of extensive blunt force traumas to his head and trunk.  Upon Rojas being restrained and in custody, Reiter opined that the Defendants assumed and became responsible for Rojas' wellbeing.  In addition, as to the PRPD Superintendent's liability, Reiter opined that the discovery was remarkable for no protocol or procedure for dealing with individuals with diminished capacities. Reiter's report was not even mentioned by the District Court in its opinion.  It was uncontroverted.

Given the foregoing, the District Court's opinion should be reversed and remanded.

## STANDARD OF REVIEW

### 1.   Evidentiary Determinations.

This Court "review[s] the district court's evidentiary determinations, namely, its decisions to admit or exclude expert testimony, for abuse of discretion." *United States, et. al. v. Brigham and Women's Hospital*; 678 F.3d 72, 83 (1st Cir. 2012); *see, also, Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142-43 (1997) (noting that abuse of discretion review applies to threshold evidentiary determination made in connection with summary judgment motions).

### 2.   Review of the "Gate-Keeping" Functions.

The question of whether the District Court actually performed its gatekeeping function, in the first place, is subject to de novo review. *Smith v. Dorchester Real Estate, Inc.,* 732 F.3d 51, 64 (1st Cir. 2013). If this Court is "satisfied that the court did not altogether abdicate its role under *Daubert,"* this Court "review[s] for abuse of discretion its decision to admit or exclude expert testimony." *Id., see also*, *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999).

### 3.    Summary Judgment Review.

"After reviewing the district court's evidentiary determinations and thereby settling the scope of the summary judgment record," this Court "review[s] the court's grant of summary judgment de novo." *Schubert v. Nissan Motor Corp. in U.S.A.,* 148 F.3d 25, 29 (1st Cir.1998); *see, also, Sch. Union No. 37 v. United Nat'l Ins. Co.,* 617 F.3d 554, 558 (1st Cir.2010).  This Court "will reverse a grant of summary judgment only if, making all factual inferences in favor of the non-moving party, a rational fact-finder could resolve the legal issue for either side." *D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co.,* 640 F.3d 27, 34 (1st Cir.2011).

### 4.    Summary Judgment Standard.

Under Rule 56(c), summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Poulis-Minott v. Smith*, 388 F.3d 354, 361 (1st Cir. 2004).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" and

hence, fall outside the scope of summary judgment." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, (2000) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

## **ARGUMENT**

## I.   **WHETHER THE DISTRICT COURT ERRED IN EXCLUDING THE PLAINTIFFS' FORENSIC EXPERT REPORT**

The crux of Rojas' complaint, in its most raw form, can be narrowed to a simple question: what caused his death?  The answers are one of two: either the physical traumas he sustained or the cocaine he ingested, at least, four hours earlier during the evening of April 10, 2007.

Pathologist Edda Rodriguez made the following findings of "external corporal trauma" in the Forensic Medical Report: (1) Laceration of the nasal bridge measuring 3/8" long; (2) Abrasion of the right fronto-temporal region measuring 1/4" x 1/4" in greatest dimension; (3) Abrasion/contusion at the level of the right zygomatic arch measuring 1 1/2" x 2 1/2" in greatest dimension; (4) Laceration of the lateral aspect of the left upper eyelid measuring 3/8" long; (5) Contusion of the left cheek measuring 3/4" x 11/4" in greatest dimension; (6) Laceration of the inferior aspect of the chin measuring 1/2" long associated with a surrounding abrasion/contusion measuring 1" x 3" in greatest dimension; (7) Contusion of the anterior aspect of the right shoulder measuring 4" x 3" in greatest dimension; (8) Multiple abrasions at the level of the right knee measuring 4" x 4" in greatest

Dimension; (9) Compression furrow around lower limbs, which is faint on the anteromedial aspect, measuring 5/8" wide; (10) Abrasion of the anterior aspect, lower third, of the left thigh, measuring 1/2" x 3/4" in greatest dimension; (11) Abrasion of the superolateral aspect of the left knee measuring 3/8" x 3/8" in greatest dimension; (12) Abrasion of the inferolateral aspect of the left knee measuring 3/8" x 3/8" in greatest dimension; (13) Abrasion of the inferomedial aspect of the left knee measuring 1" x 11/2" in greatest dimension; (14) Contusion at the level of the left knee measuring 4" x 4" in greatest dimension; (15) Abrasion of the anterior aspect, upper third, of the left leg measuring 1/2" x 1/2" in greatest dimension; (16) Contusion of the anterolateral aspect of the right arm measuring 3" long; (17) Abrasion/contusion around the lower third of both wrists measuring 3/8" wide on the right wrist and 1/4" wide on the left; (18) Petechial hemorrhage on the superior aspect and right side of the back; (19) Abrasion of the superolateral aspect of the left buttock measuring 11/2" x 1/4" in greatest dimension; (20) Abrasion of the posterolateral aspect of the right wrist measuring 1/4" x 1/8" in greatest dimension; (21) Abrasion of the posterolateral aspect of the left wrist measuring 3/4" in greatest dimension; (22) Two (2) abrasions on the back of the left hand measuring together 3/4" x 1/4" in greatest dimension; (23) Laceration of the posteromedial aspect of the left wrist measuring 3/8" long, associated with a surrounding abrasion measuring 3/4" x 11/4" in greatest dimension.  JA 259-260.

The FSI autopsy photographs show the signs of violence listed above. The internal examination of the cadaver revealed, *inter alia*, that in the brain the cerebral "circumvolutions [we]re widened and the grooves [we]re obliterated" and there was a "hemorrhagic infiltrate in the subarachnoid space at the level of the left parietal lobe and the cerebellum" (JA 261); and, that there was an "area of hemorrhagic infiltrate in the costal muscles at the level of the 7th and 8th right intercostal space" in the thorax (JA 262). The Forensic Medical Report, however, lacks the requisite medical history -- as is devoid of any explanation -- regarding the cause of the eternal "[m]ultiple abrasions, lacerations and contusions throughout the body surface" as well as of the internal "[s]ubarachnoid hemorrhage of the left parietal lobe and the cerebellum," the "[c]erebral edema" and the "[h]emorrhagic infiltrate at the level of the 7th and 8th right intercostal muscle" described therein (JA 263-264). Likewise, the police officer Defendants blatantly failed to advance any facts that could explain such external and internal trauma.

Upon reviewing Rojas' case file, Dr. Adele Shaker, Plaintiffs' expert witness in anatomic pathology and forensic pathology, made the following findings in his expert report:

**Blunt force trauma to head, face, trunk, and extremities**:

There are multiple lacerations on the nose, left upper eyelid, mandibular chin, and left wrist. Extensive contusions involved on the right zygomatic arch, left cheek, right shoulder, both right and left knee, right arm, and both wrists. Numerous geographically distributed

24

abrasions and contused abrasion are located over the right side of the face, dorsal aspect of both hands, both knees, right shoulder, left leg, and left lower back.

Some of the patterned injuries especially the left and right wrists are consistent with handcuffs. The right shoulder contused abrasions are consistent stomping injuries with imprint a shoe sole. The lower third of the right and left leg contused abrasions are consistent with patterned shackles.

Extensive contusions of the anterior muscles of the neck are noticed accentuated on the left side.

The wedge shaped hemorrhagic infarcted area of the upper lobe of the left lung and the hemorrhages surrounding the right 7th and 8th intercostal spaces are consistent with marked blunt force injuries to the chest.

The subarachnoid hemorrhages on the left parietal and occipital cerebral hemispheres accentuated on the lateral and medial aspects of the left parietal lobe and the contusions of the cerebellum are consistent with coup and contrecoup injuries due to markedly severe blunt force trauma to the head.

Examination of the brain revealed obliterated sulci and expanded gyri consistent with marked global cerebral edema. The medulla oblongata revealed an area of hemorrhages consistent with possible tonsillar herniation. Right tentorial (uncal) herniation is noticed.

JA 367, 461. Dr. Shaker concluded as follows:

The constellation of the above mentioned blunt force injuries of the deceased [Rojas] with the fatal subarachnoid hemorrhage and brain herniation are due to extensive non-accidental inflicted trauma to his body while he was constrained by handcuffs and shackles in police custody.

I state with a reasonable medical certainty that [Rojas] died from extensive blunt force trauma to the head and trunk.

JA 367-368, 462.    Dr. Shaker's opinions are predicated on the autopsy photographs, the findings of the external and internal examination of the cadaver set forth in the Forensic Medical Report, and the Toxicological Test Results -- the same data upon which Pathologist Edda Rodriguez based her conclusions.  To state the obvious, Dr. Shaker did not contest the findings of the external and internal examinations set forth in the Forensic Medical Report.   Rather, Dr. Shaker's opinions rebut and disprove Dr. Rodriguez's conclusions that the "cause of death" was "bodily trauma [and] cocaine intoxication."   On the basis of the same underlying data, Dr. Shaker opined that, "Rojas Miranda died from extensive blunt force trauma to the head and trunk."  JA 263-264, 461-462 & 767.

Regarding the cocaine as cause of death, Dr. Shaker concluded that the autopsy report contained a series of fallacies as follows:

1) The collected blood sample is unknown whether from peripheral or central blood (heart) as the potential of postmortem redistribution should be put into consideration to reflect the actual and true level of cocaine before death.

2) The half-life of cocaine is thirty to ninety minutes and the parent drug could not be found in the blood analysis after that time. Cocaine also continues to be metabolized even after death. If [Rojas] died several hours after arrest in the police custody,[4] his blood would not have revealed the parent drug cocaine, but only its metabolites.  The  validity  and  credibility  of  the  toxicological

---

[4] When Trinidad saw Rojas at about 6:00 p.m., that evening he was already "high."  JA 357 & 380-381.  Rojas was pronounced dead by paramedics almost four hours later, at 9:50 p.m.  JA 554.  Rojas had no drugs on him and none were found in his car.

> analysis is questionable and should be reevaluated if the blood
> sample is still available.

JA 368, 461-462.

The foregoing circumstantial evidence, coupled with the yet unexplained corporal trauma exhibited by Rojas is more than sufficient to provide a firm foundation for Dr. Shaker's opinions.

The admission of expert evidence is governed by Federal Rule of Evidence 702, which codified the Supreme Court's holding in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), and its progeny. *See, United States v. Diaz,* 300 F.3d 66, 73 (1st Cir. 2002). The Supreme Court asserted in *Daubert* that trial courts perform a gatekeeping role in regulating the admission of expert testimony under Fed. R. Evid. 702." *Diaz,* 300 F.3d, 73 (citing *Daubert,* 509 U.S., at pp. 589-95). "That screening function entails a preliminary evaluation of the proffered expert testimony for both reliability and relevance." *Diaz, 300 F.3d, 73* (citing *Daubert,* 509 U.S., at pp. 591-595; *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 80 (1st Cir. 1998). Expert testimony is only admitted when "(1) it is based upon sufficient facts or data, (2) it is the product of reliable principle and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Rivera v. Turabo Med. Ctr. P'ship,* 415 F.3d 162, 170 (1st Cir. 2005) (quoting Fed. R. Evid. 702). The proponent of the expert testimony bears

the burden of establishing, by a preponderance of the evidence, the admissibility of the proffered expert testimony.  *Kumho Tire Co.*, 526 U.S., at 152.

Under the *Daubert* framework, the District Court had to determine if Dr. Shaker's opinion was scientifically reliable.  *Daubert,* 509 U.S., at 592-93.  The question then is not whether Dr. Shaker is qualified in general, but whether his "qualifications provide a foundation for [him] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010).  Dr. Shaker fully explained in his report the scientific methodology he used -- widely accepted in the field of forensic pathology -- to arrive at his opinion.[5]  A cursory review of his report readily demonstrates that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion."  *Ruiz-Troche,* 161 F.3d, at 85*; see, also, United States v. Vargas,* 471 F.3d 255, 265 (1st Cir. 2006).

Notwithstanding, the District Court took issue with the fact that Dr. Shaker did not eliminate other causes of death.  JA 802.  However, "an expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome.  The possibility that [another] cause [] was ultimately responsible for [his] injury is properly left for exploration on cross-examination… . Similarly, the accuracy and

---

[5]  For example, Dr. Shaker addressed and explained the conditions and the characteristics of *Subarachnoid Hemorrhage, Herniation Syndromes, Coup and Countercoup Injuries, Pattern Injuries, Stomping, Handcuffs and Shackles.*  JA 459-450.

truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation. ,.. Further, whether the cause put forth by a qualified expert actually proximately caused the injury at issue is a question for the jury at trial; a district court should only evaluate whether an expert's conclusion on causation was reasoned and based on a reliable methodology." *Gayton*, 593 F.3d, at 619 (internal citations omitted).

The District Court relied primarily in the case of *Hayes v. Douglas Dynamics, Inc*., 8 F.3d 88 (1st Cir. 1993). *Hayes* involved a car accident leading to a death where the "central issue in th[e] case" was "[e]xactly which part of the truck hit the [car]." *Id,* at 89. In *Hayes,* the plaintiff's experts were unable to substantiate their opinions. The *Hayes* Court held that when an expert opinion presents no facts, nor "a hint of an inferential process, no discussion of hypotheses considered and rejected," such testimony will be insufficient to defeat a motion for summary judgment. *Id,* at 92. "Although an expert affidavit need not include details about all of the raw data used to produce a conclusion, or about scientific or other specialized input which might be confusing to a lay person, it must at least include the factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment." *id*.

The situation with Dr. Shaker's expert witness report is clearly inapposite to the situation in *Hayes.* Dr. Shaker described the items he reviewed, including Dr.

Rodriguez's pathology report, to reach his conclusions.  Dr. Shaker explained in

plain language his opinions and conclusions, with factual and scientific criteria and

support.  He had virtually identical findings to Dr. Rodriguez -- whose report

causes concern given her opinion of an "accident" as the manner of death (JA 264),

when there is not any indicia that the police provided any information neither for

her to arrive at that conclusion nor to explain the external and internal trauma listed

in the autopsy report.  In fact, when the crux of the reports is revisited -- what

caused Rojas' death -- the only variation between the two physicians is causation.

Additionally, the District Court made a critical error.  Although a district

court is afforded great discretion in deciding whether to admit or exclude opinion

evidence, it must carry out that function; here, it was obviated.  The Court simply

took issue with Dr. Shaker and made no determination of its admissibility under

*Daubert* criteria, notwithstanding a challenge presented by Defendants.  JA 720-

726.  The Court could not properly conduct its summary judgment analysis without

determining the admissibility of Shaker's report, which speaks directly to issues at

the heart of Rojas' claims.  "By failing to exercise its discretion, namely, failing to

admit or exclude [Shaker's] report, the district court committed an error of law

and, thereby, abused its discretion."  *United States, et. al. v. Brigham and Women's

Hospital*; 678 F.3d, at 84.

Given the foregoing, the District Court applied a standard of scientific certainty to Dr. Shaker's testimony beyond that which *Daubert* envisions. The Court imposed a threshold requirement that science be able to declare with complete certainty the cause of death of an individual that presents Cocaine in his bloodstream as well as multiple bodily traumas. "This requirement solicits a level of assurance that science realistically cannot achieve and that *Daubert* does not demand. *See, Daubert*, 509 U.S. at 590 (commenting that 'arguably, there are no certainties in science'). The adoption of such a standard impermissibly changes the trial judge's role under *Daubert* from that of gatekeeper to that of ***armed guard.*** That mistaken application of the law likewise constitutes an abuse of discretion." *Ruiz-Troche* 161 F.3d, at 86 (emphasis supplied).

## II.  WHETHER THE DECEDENT WAS SUBJECTED TO A DEPRIVATION OF CONSTITUTIONAL RIGHTS

Section 1983 grants citizens a private right of action against persons acting under color of state law for "the deprivation of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *Camilo Robles v. Zapata,* 175 F.3d 41, 43 (1st Cir. 1999). To state a valid claim under 42 U.S.C. § 1983, a plaintiff must allege and prove the following elements: (1) that the conduct complained of was committed by a person acting under color of state law; (2) that this conduct deprived plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States; and, (3) that the defendant was

personally and directly involved in causing the violation of the plaintiff's federally protected rights. *Rodriguez-Vazquez v. Cintron-Rodriguez,* 160 F. Supp. 2d 204, 209-210 (D.P.R. 2001) (collecting Supreme Court and First Circuit cases). This third element requires a showing that the defendant's conduct was a cause of the alleged deprivation of the plaintiff's rights secured by the Constitution or federal laws. *Id.; see, also, Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 831 (1st Cir. 1987) ("Section 1983 imposes a causation requirement similar to that of ordinary tort law"). This may consist of direct acts by the defendant, certain acts performed at defendant's direction, or knowledge and consent. Each defendant individually responds for his own acts and omissions in the light of his own duties. *Rodriguez-Vazquez,* 160 F. Supp., at 210.

There is no dispute that the Defendant police officers were acting under color of law. There are sufficient facts in the discovery record to establish that Rojas was deprived of his rights to be free of excessive use of force and to be provided medical attention for his serious needs.

A.    ***Defendants' Deliberate Indifference To Rojas' Serious Medical Needs.***

The Fourteenth Amendment to the U.S. Constitution provides that no state shall deprive any person of life, liberty or property without due process of law. U.S. CONST. Amend. XIV; *see,* generally *Board of Regents v. Roth,* 408 U.S. 564, 569-70 (1972). This due process clause requires the responsible governmental

authorities to provide medical care to persons who have been injured while being apprehended by the police or who are exhibiting symptoms of diminished mental capacity at the time of arrest. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244 (1983); *Gaudreault v. Salem,* 923 F.2d 203, 208 (1st Cir. 1990); *Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir. 1991); *Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 560 (1st Cir. 1988).*

Government officials violate this Constitutional requirement when they exhibit "deliberate indifference" to "serious medical needs," including "mental health and safety needs." *Montes v. Ponce Municipality,* 79 Fed. Appx. 448, 450 (1st Cir. 2003); *Gaudreault , 923 F.2d, at 208; Torraco,* 923 F.2d, at 234. "A 'serious' medical need is one diagnosed by a physician as mandating immediate treatment, or one that is 'so obvious' that a layman would 'easily' recognize the necessity for medical treatment." *Montes,* 79 Fed. Appx., at 450 (quoting *Gaudreault,* 923 F.2d, at 208*).*

The test for deliberate indifference is whether "the official knows of and disregards an excessive risk to [the detainee's] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (U.S. 1994). "Whether [an] official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the

33

usual ways, including inference from circumstantial evidence [and] a factfinder may conclude that [an] official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. *See, also, Barbosa v. Conlon,* 2013 U.S. Dist. LEXIS 81202 (D. Mass. 2013) (quoting *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir. 1991) ("The requisite state of mind may be manifested by the official['s] response to [the plaintiff's] known needs or by denial, delay, or interference with prescribed health care."). The evidence herein meets the requirements of the test for deliberate indifference.

Over the last year before his death, Rojas used cocaine perhaps twice a week. When he was high, Rojas became nervous with a sense of persecution and drove improperly; however, he was not violent. On April 10, 2007, Rojas snorted cocaine. Trinidad first saw Rojas that day at home at about 6:00 p.m. and he appeared to be "high." When Trinidad next saw Rojas about 45 minutes later, he seemed okay. "[H]e had already gotten over it." JA 357 & 381. Sometime between 7:00 to 7:30 p.m., Rojas stepped out of his house to buy refreshments.

At approximately 8:15 p.m., police officers Perez and Rivera spotted Rojas driving in an erratic manner and chased Rojas until he brought his car to a halt on the side of the road. When the deputies stepped out of the patrol car and intervened with Rojas, they observed Rojas agitated, anxious and sweaty; his face was extremely pale and turning purplish; his lips were black; his eyes were wildly

34

opened; and the veins in his temples were bulging.  Both deputies perceived that Rojas was exhibiting classical paranoid behavior (*e.g.,* looking in every direction, fearing for his life and repeating that someone was following him).  Rojas was delusional, disoriented and out of himself.  He was shouting incoherently.  Perez could not determine to whom Rojas was directing his rant; and Rojas would simply not respond to any of Perez's inquiries regarding his mental condition.  Rojas also engaged in unprovoked aggressive behavior toward the police officers.  When Sergeant Rodriguez arrived at the scene, he saw Rojas handcuffed inside the patrol car exhibiting such paranoid behavior and also perceived that his verbal expressions were incoherent.  The seriousness of Rojas' needs for medical care was obvious even to a layperson.   Indeed, eyewitness Jose Candelaria also observed Rojas at the scene agitated and incoherent, noting that Rojas' face was purplish.

In view of the bizarre behavior displayed by Rojas, Sgt. Rodriguez instructed deputies Rivera and Perez at the scene to take Rojas to a CDT.  However, the Sergeant allowed the officers to make a medical judgment call and override his order to take Rojas to a medical facility.  The delay in providing medical care certainly created a substantial risk of serious harm.  The police officers were aware of Rojas's obvious and serious need for medical treatment and delayed medical treatment of that condition for non-medical reasons.  Rojas was

taken to the police station and placed in a holding cell, where he was left alone, face down on the ground, cuffed at the wrists behind his back and tied at the ankles. The paramedics found his lifeless body in the holding cell and reported that he had no vital signs at 9:50 p.m.

Mr. Lou Reiter, an expert consultant in police practices, reviewed the pleadings, reports and discovery exchanged by the parties in the pre-trial proceedings. On basis of his fifty plus years of experience, training, education and knowledge in police practices and law enforcement, he rendered a report in this case. JA 364 & 420-439. He rendered the following opinions regarding the deliberate indifference to the decedent's urgent medical needs displayed by Rodriguez, Rivera and Perez:

> Officers Perez and Rivera and Sgt. Rodriguez all have stated that Mr. Rojas was exhibiting symptoms of a person of diminished capacity. Officer Perez stated that Mr. Rojas at the scene "was extremely sweaty, disoriented and bug-eyed" and continuously insisting that he was being followed by "a big black bus" and "wanted to kill him." Officer Rivera stated similar observations and that his "face was extremely pale, his lips were very black." Sgt. Rodriguez stated similar observations and ordered the officers to take Mr. Rojas to the hospital. The officers, contrary to this order from their supervisor, took Mr. Rojas to the police station and there had to also shackle his feet.
>
> . . . . .
>
> Once a subject is controlled and taken into police custody, the subject becomes the ultimate responsibility of the officers and any other sworn member of the Police Department who has knowledge of the subject's condition. This is a common and generally accepted police practice. ... In the field of prisoner transportation, there are few issues of greater interest for judicial oversight than the well-being of

36

prisoners in custody.

. . . . .

Officers Perez and Rivera made a conscious choice to ignore this essential prisoner well-being provision and disregard the direct order from their supervisor, Sgt. Rodriguez. Of course, Sgt. Rodriguez cannot escape accountability for allowing the officers to ignore his order to take Mr. Rojas to the hospital. Of top of these deliberately indifferent decisions, the officers took Mr. Rojas and further restrained him by shackling his legs. It was only when the officers noticed that Mr. Rojas was now in severe medical distress did they summon medical assistance. This delay was their choice and an indication of their deliberate indifference to Mr. Rojas' safety and well-being.

JA 431-434. Certainly, "[t]he failure to provide immediate medical care to someone whom the officers and supervisor acknowledged was exhibiting symptoms of a person of diminished capacity was a conscious choice and demonstrated deliberate indifference" to the decedent's urgent medical needs by the arresting officers. JA 364, 427. Mr. Reiter' expert opinions are uncontroverted and unopposed by a qualified professional.

Notwithstanding the delusional behavior displayed by Rojas and his non-responsiveness to officer Perez's inquires about his health at the scene, the Court found that "the decedent acknowledged to Officer Pérez that he was fine." JA 805. Certainly, Rojas' behavior evidenced that he was not well and that his mental capacity was diminished. Moreover, the Court noted that "[a]ccording to Defendant Pérez, the decedent's temple and front part of the head started turning purplish" in the holding cell, ignoring the fact that Perez testified in his

contemporaneous sworn statement that when he intervened with Rojas at the arrest site, Perez "noticed him to … [have] a purplish coloring in his forehead features, temple and cheeks and skin."  JA 564.  Indeed, eyewitness Jose Candelaria also saw that Rojas face was purplish at the scene of the arrest.

Further, the Court's conclusion that "the decedent did not have a medical need so obvious that even a lay person would easily recognize the need for medical attention" because Jose Candelaria "acknowledged that the only injury he could observe on the decedent was a small cut in his lips" (JA 807) shows that the Court misapprehended Plaintiffs' claim for deliberate indifference to the decedent's serious medical needs.  This claim does not relate to any physical injuries; indeed, it is uncontested that he had none at the scene.  Instead, such claim is predicated on the decedent's evident diminished mental capacity at the scene, which required immediate medical attention and none was provided.

The Court's reliance on *Gaudreault v. Munic. of Salem, Mass.,* 923 F.2d 203 (1st Cir. 1990) is misplaced.  Herein, as opposed to *Gaudreault*, Rojas did not exhibit any physical injuries at the scene.  Instead, Rojas displayed symptoms of diminished mental capacity caused by Cocaine (or a similar drug) intoxication, where time is of the essence and a brief delay in medical treatment could make the difference between life and death.  The factual scenario and legal landscape in this case is similar to those in *Border v. Trumbull County Bd. of Comm'rs,* 414 Fed.

Appx. 831 (6th Cir. 2011), *Estate of Lawson v. City of Hamilton,* 2009 U.S. Dist. LEXIS 43391 (S.D. Ohio 2009) and *Bradway v. Town of Southampton,* 826 F. Supp. 2d 458 (E.D.N.Y. 2011).

In *Border,* a detainee was booked into a jail by an officer and found dead the following morning of a drug overdose. Given the officer's observation of "the altered forms that [the detainee] appeared to be 'under the influence of barbiturates, heroin or other drugs' and suffered a recent head injury, coupled with [the detainee's] signs of physical incapacity, severe intoxication and obvious disorientation witnessed by the inmates during the period [the officer] was interacting with [the detainee]," the Sixth Circuit concluded that the evidence "sufficiently establish[ed] from an objective standpoint that a serious medical need existed and, in addition, that a reasonable jury could conclude that [the officer] was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed[ed] and [he] ignored that risk." 414 Fed. Appx., at 838 (internal quotation marks and citations omitted).

In the same vein, in *Estate of Lawson,* police officers took a 20-year-old female to a holding cell at the police headquarters after she was arrested for driving under the influence of alcohol; six hours later, a desk officer found her dead in the cell. The county coroner determined that she died of a drug overdose involving cocaine and methadone. Given that she remained in the cell in a "contorted and

bizarre position that a person would not normally fall asleep in or remain asleep in for an extended period of time," the Court found genuine issues of material fact as to whether the desk officers were deliberately indifferent to the decedent's serious medical need which precluded entry of summary judgment. 2009 U.S. Dist. LEXIS 43391, at * 49; *id.,* at ** 50-51. The Court also found that there was a trial issue as to whether there was supervisory liability under a theory of failure to train the officers in recognizing the symptoms of a person under the influence of drugs or suffering from a drug overdose. *Id.,* at ** 51-52.

Likewise, in *Bradway,* the officers watched the arrestee ingest cocaine, he admitted to ingesting a large amount of cocaine and exhibited signs of distress. After arriving at the police station, the detainee exhibited signs that led an officer to conclude that he needed hospitalization, but the police waited for an officer to return from the field to transport him to the hospital. Approximately 1 hour and 45 minutes elapsed from the time of ingestion of the drugs until the police arrived at the hospital, where the detainee died shortly thereafter from seizures and multiple systems failure due to acute cocaine intoxication. Given such evidence, after conducting an independent research and carefully examining other cases that have dealt with the ingestion of drugs in the medical indifference context, the Court concluded there was sufficient evidence for the plaintiff's claim to survive summary judgment. 826 F. Supp., at 472-473. In doing so, the Court noted that it

was "unaware of any federal cases involving analogous circumstances where summary judgment has been granted on a medical indifference claim." *Id.,* at 473.

In the case at hand, it is plain that the two police officers and the sergeant were responsible for Roja's safety and well-being. *See, DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.,* 489 U.S. 199-200, ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). The evidence here clearly establishes that Rivera, Perez and Rodriguez committed "acts or omissions ... sufficiently harmful to evidence deliberate indifference to [Roja's] serious medical needs." *Leavitt v. Corr. Med. Servs.,* 645 F.3d 484, 497 (1st Cir. 2011). Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed.]" *Id.* Sgt. Rodriguez, in fact, drew such inference when he ordered Rivera and Perez to take Rojas to a medical facility. Defendants' decision to deny Rojas medical care for his urgent mental needs was made with "actual knowledge of impending harm, easily preventable." *Id.*

Therefore, Plaintiffs have established an actionable Fourteenth Amendment claim for deliberate indifference to the decedent's serious medical needs.

## B.    *Rojas Was Victim Of Use Of Excessive Force*

The Fourth Amendment guarantees individuals the right to be secure in their persons and houses against unreasonable searches and seizures of the person. U.S. CONST. Amend. IV; *see, Graham v. Connor,* 490 U.S. 386, 394 (1989).   The standard for assessing claims of excessive force during a search or seizure is well established in this circuit:

> To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer[s] employed force that was unreasonable under the circumstances.  Whether the force used to effect a particular seizure is reasonable must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight.  The reasonableness inquiry is objective, to be determined in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.  There must be careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Jennings v. Jones,* 499 F.3d 2, 11 (1st Cir. 2007) (quoting *Graham* 490 U.S., at 396-397) (citations and quotation marks omitted).  Recently, the Supreme Court reiterated this standard.  "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014).  "[D]etermining the ... reasonableness of a particular seizure ... 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests

42

against the countervailing governmental interests at stake.'" *Id*. Herein, the defendant police officers employed force that was unreasonable under the circumstances.

There was a scuffle between the two arresting officers and Rojas at the detention site, where all three went to the ground and Rojas landed "on his stomach on the road." JA 360 & 209-210. Rojas was then handcuffed behind his back, pulled up and left sitting on the ground while reinforcements arrived; at that time, *Perez observed that Rojas "did [not] have visible injury or bruise" on him.* JA 215-217. Likewise, Sergeant Rodriguez, who arrived at the scene by the time Rojas was handcuffed and in custody, categorically testified that *"[Rojas-Miranda] had no blows whatsoever."* JA 655-656. Jose Candelaria, a civilian who witnessed the whole incident at the scene, corroborated that at the time the arrestee was placed inside the patrol SUV, *"the only thing [he] could observe was that [Rojas] had a small cut in his lips."* JA 118.

Once arrested, Rojas was transported by officers Perez and Rivera to the police station. Shortly thereafter, Sgt. Rodriguez arrived at the station as well and ordered all of the other police offers out of the station; remaining only the three defendants and a desk attendant. Deputies Perez and Rivera, in the presence of Sgt. Rodriguez, placed Rojas face down on the floor of a holding cell, where he remained cuffed at the wrists behind his back and was also then tied at the ankles.

Rojas stayed face down on the floor of the cell, fully restrained, and never stood up.  Sgt. Rodriguez and officers Perez and Rivera were the last persons to see Rojas alive.  The next persons who would see Rojas were paramedics who found his lifeless body in the holding cell and reported that he had no vital signs.  Shortly thereafter, PRPD homicide officer, Braulio Gonzalez, arrived at the police station, examined the cadaver and provided the following description of what he saw:

> As a sign of violence [the decedent] had a laceration in the lower left part of his back.  His right eyebrow had a laceration and an injury in the area of the chin.  He had marks on his wrists and both knees were lacerated and he had a small cut on his left eyebrow.

JA 363 & 553.  The Forensic Medical Report listed "[m]ultiple abrasions, lacerations and contusions throughout the body surface" and described internal "[s]ubarachnoid hemorrhage of the left parietal lobe and the cerebellum," "[c]erebral edema" and "[h]emorrhagic infiltrate at the level of the 7th and 8th right intercostal muscle."  JA 263-264.  Likewise, photographs taken by the FSI demonstrated that Rojas exhibited multiple significant traumas and lesions in different parts of his body.  JA 363 & 442-455.  Such is in marked contrast to Defendant police officers' version that Rojas was not harmed in the holding cell.

The foregoing circumstantial evidence, coupled with the yet unexplained corporal trauma exhibited by Rojas, is more than sufficient to provide a firm foundation for Dr. Adele Shaker's opinion that the cause of death of Rojas was extensive blunt force trauma to the head and trunk.  In turn, Mr. Lou Reiter,

concluded: "The injuries suffered by Mr. Rojas as depicted in the autopsy and medical expert report would constitute … a use of force contrary to generally accepted police practices and excessive for the circumstances described by the arresting officers." JA 364 & 427.

The evidence establishes that the police officers Defendants employed force that was excessive and unreasonable under the circumstances after Rojas' arrest and which led to his lingering death in the holding cell. *Jennings,* 499 F.3d, at 11. Rojas, therefore, has a viable claim for the use of excessive force under the Fourth Amendment.  Further, Roja's Fourteenth Amendment violations are substantive in nature.  A substantive due process violation is one in which officers take action that can "properly be characterized as ... conscience shocking."  *County of Sacramento v. Lewis,* 523 U.S. 833, 847 (1998).  The conscience-shocking standard provides relief where government officials have "abused [their] power, or employed it as an instrument of oppression." *Id.,* at 846, quoting *Collins v. City of Harker Heights,* 503 U.S. 115 (1992).  The conduct of the police officers Defendants unquestionably rises to the level of truly outrageous, uncivilized, and intolerable behavior that implicates a violation of the Fourteenth Amendment. *See, Rochin v. California,* 342 U.S. 165, 172-173 (1952).  Therefore, Rojas also has a viable excessive force claim under the Fourteenth Amendment. *Aponte Matos v. Toledo Davila,* 135 F.3d 182, 191 (1st Cir. 1998).

## III.  WHETHER THE PRPD SUPERINTENDENT CAN BE HELD LIABLE FOR THE CONDUCT OF HIS SUBORDINATE POLICE OFFICERS

In the context of Section 1983 actions, supervisory liability typically arises in one of two ways: either the supervisor may be a "primary violator or direct participant in the rights violating incident," or liability may attach "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999).  The relevant inquiry is "whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort." *Id.*  In either case, the plaintiff in a Section 1983 action must show an "affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization" between the actor and the underlying violation. *Id.  See, also, Ocasio-Hernandez v. Fortuño-Burset,* 640 F.3d 1, 16 (1st Cir. 2011).

In the absence of some kind of personal participation in the deprivation, the causal connection alluded to by Sect. 1983 can be satisfied by conduct "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Sanchez v. Pereira-Castillo,* 590 F.3d 31, 50 (1st Cir. 2009) (internal citations and quotation marks

46

omitted).   Put another way, an actor is "responsible for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties."  *Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 561 (1st Cir. 1989) (internal citations and quotation marks omitted).

This Court has declined to adopt a broad sweeping restriction of an automatic preclusion of supervisory liability under *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).  *See, Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014). "After Iqbal, as before," this Court has "stressed the importance of showing a strong causal connection between the supervisor's conduct and the constitutional violation," "as that requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation."  759 F.3d, at 19 (internal citations and quotation marks omitted).

In the instant case, the crux of the supervisory liability was lack of articulable guidelines and protocols to deal with a citizen's medical needs when obviously experiencing mental diminished capacity as a result of drug or substance use.  In order to establish supervisory liability under § 1983, Plaintiff must show that the supervisor's failure to train officers regarding drug-intoxication "amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris,* 489 U.S. 378, 388 (U.S. 1989); *see also, Whitefield v. Melendez-Rivera*, 431 F.3d 1, 10 (1st Cir. 2005) (A city's policy of

inadequately training its police force can serve as a basis for § 1983 liability if the city's failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact.").

Officer Perez entered the PRPD in 1993. His training at the police academy lasted between seven to eight months.  While at the academy, Perez was trained in the subjects of criminal law, civil rights, criminology, physical training, criminal procedure, the criminal code, evidence and use of force during an arrest.  After officer Perez left the academy and up to April 2007, when the intervention with Rojas occurred, Perez had not received any training.  JA 363; 634-637.

Mr. Lou Reiter rendered the following opinions concerning supervisory practices and Superintendent Toledo's failure to supervise:

> The Puerto Rico Police Department has continuously and historically chosen to not control, oversee or supervisor field officers' uses of force and allegations of police misconduct.

JA 364 & 427.

> In numerous civil cases that I have been involved in concerning members of the Puerto Rico State Police, the issue of use of force has been a specific element of the case. In one such case I opined [] that the supervisory control procedures for officers' use of force was extremely deficient and evidenced a deliberate indifference on the part of supervisors, managers, command officers and the Superintendent.
> 
> . . .
> 
> This similar supervisory deficiency was addressed in a recent case in which I was deposed involving the use of force involved in a shooting death by members of the Puerto Rico Police Department.  *Ramirez-Lluveras, et al., v. Pagan-Cruz, et al.* Civil No. 08-1486 RLA. In this case Superintendent Toledo, by interrogatory answer and deposition,

48

acknowledged that the Police Department had no statistical information regarding uses of force including deadly force.

The consequence of not having these common and generally accepted supervisory oversight tools in place is that field officers learn that their uses of force will not be scrutinized and they will not be held accountable for improper and/or excessive uses of force.

In this matter Officers Perez and Rivera and Sgt. Rodriguez all deny that any unreasonable use of force was used. The investigative follow-up was perfunctory and consistent with my understanding of similar investigations in the past. This failure by the Police Department would have been known to officers, such as Perez and Rivera and Sgt. Rodriguez. Their denials are simply accepted without question or challenge with the medical evidence.

Officers Perez and Rivera and Sgt. Rodriguez have had prior citizen complaints alleging improper use of force, verbal assault and fabrication of evidence. Officer Perez record shows 9 complaint investigations including a 60 day suspension for "immoral conduct" where he gave theft evidence taken from suspects to himself and others; 2 negligence during investigations; and an assault. The cases from 2002 and 2006 are still pending disposition. Sgt. Rodriguez' record discloses 8 complaint investigations between 1999 and 2009; 4 since 2005 are still pending disposition. Officer Rivera's record indicates 3 complaint investigations between 2002 and 2007.

. . .

In all of the cases I have been involved as an expert police practices expert involving members of the Puerto Rico Police Department, dating back into the late 1970s, th[e] essential supervisory control system of investigating citizen complaints and other information regarding alleged police officer misconduct has been consistently and deliberately been handled by supervisors, managers and superintendents in a severely deficient manner. These supervisors, including Superintendent Toledo, have not even followed their own agency's written protocols. Supervisors continue to not follow the provisions of the General Order issued in 1987 that required them to access and become familiar with the complaint and disciplinary history of all personnel under their command.

> Superintendent Toledo, in his answers to interrogatories, stated that there are written orders and training for officers to "handle suspects which present possible mental instability or might be suicide risk … constant vigilance and watch over the suspect is also instructed until proper medical personnel can take over the situation." These documents have not to my understanding been produced and, of course, none of the officers involved directly with Mr. Rojas functioned in this capacity to provide reasonable care for his well being.

JA 364, 430-431, 434 & 437-438.  Mr. Lou Reiter's opinions are uncontested.

On the basis of the foregoing evidence, Plaintiffs have established actionable Fourth and Fourteenth Amendment claims for supervisory liability against Toledo.

## IV.  WHETHER THE DECEDENT'S RIGHTS WERE CLEARLY ESTABLISHED WHERE A REASONABLE PERSON SHOULD HAVE KNOWN THAT SUCH CONDUCT VIOLATED HIS RIGHTS

Qualified immunity is a defense where government officials performing discretionary functions are generally shielded from liability for civil damages, insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person should have known.  *See*, *Harlow v. Fitzgerald,* 457 U.S. 800 (1982); *Surprenant v. Rivas*, 424, F. 3d 5 (1st Cir. 2005).  Additionally, qualified immunity "provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  As a general rule "the qualified immunity defense should prevail unless the unlawfulness of the challenged

50

conduct was 'apparent' when undertaken." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004).

In *Pearson v. Callahan*, 129 S. Ct. 808 (2009), the Supreme Court changed the qualified immunity inquiry into a two-part test. A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. *Id.,* at pp. 815-16. The second step, in turn, has two aspects. *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir. 2009). First, whether "[t]he contours of the right [were] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." Id. (quoting *Anderson*, 483 U.S., at 640). Second, "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights in the situation with which the defendant was confronted." *Id.* The salient question is whether the existing case law gave the defendants "fair warning that their conduct violated the plaintiff's constitutional rights." *Suboh v. Dist. Attorney's Office of Suffolk*, 298 F.3d 81, 93 (1st Cir. 2002). In other words, the law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct" at issue. *United States v. Lanier*, 520 U.S. 259, 271 (1997). "It is

51

important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004). "[A] plaintiff need not present an identical case to show that the law was clearly established; instead, a plaintiff must only show that the 'contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1241 (10th Cir. 1999) (quoting *Anderson,* 483 U.S., at 640).

The District Court opined that, "[T]he arresting officers used only the necessary force in subduing and placing Rojas-Miranda inside the holding cell. The record is devoid of any evidence, direct or circumstantial, that any one of the arresting officers savagely beat the decedent." JA 812. Based on such finding, the Court concluded that Defendants were entitled to qualified immunity on Plaintiffs' Fourth Amendment excessive use of force claims. *Id.* Such analysis, however, does not follow the controlling standard on a motion for summary judgment: "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Poulis-Minott*, 388 F.3d, at 361. Viewed in the light most favorable to Plaintiffs, the overwhelming circumstantial evidence on record is sufficient to establish that the arresting

officers beat-up the decedent while he was fully restrained, causing him to suffer a lingering death in the holding cell.

Furthermore, the District Court posited in its opinion that Defendants could be entitled to qualified immunity because of the lack of clarity of the law, given that the Constitutional rights were not clearly established at the time of the alleged violations.  JA 812, n. 15.  We disagree.

The law was very clear on that officers cannot use excessive force; under the Fourth Amendment, only reasonable force may be used.  *See, Tennessee v. Garner*, 471 U.S. 1, 7-12 (1985); *Graham v. Connor*, 490 U.S. 386, 397 (1989).   In addition, Courts addressing the confusion of whether the Fourth or Fourteenth Amendment applies after the individual is in custody have recognized that the substantive prohibitions were clearly established.  *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) ("the contours of [] Fourth Amendment rights were sufficiently clear that a reasonable official would understand that what he is doing violates that right throughout the period of [] detention) (internal citations omitted).  The confusion is just as to what is the appropriate legal doctrine to apply.  The question is not if a claimant has or does not have defined actionable remedy.

There is a split between the Circuit Courts of Appeals on this matter: the Second, Sixth, Ninth and Tenth Circuits have found that the Fourth Amendment provides the proper constitutional standard for claims of excessive force that arise

after a warrantless arrest but before a probable cause hearing or arraignment; the Fourth, Fifth, Seventh and Eleventh Circuits have held that the Fourth Amendment becomes inapplicable after the act of arrest, and instead post-arrest claims of excessive force are analyzed as substantive due process claims under the Fourteenth Amendment; and the First Circuit has not decided what constitutional provision applies in this situation and what would be the appropriate standard of review.  *Moreau v. Gerardi*, 2010 U.S. Dist. LEXIS 124613, **19-20 (D. Mass. 2010) (citing the cases).

The Fourth Amendment looks to the objective reasonableness of the officer's actions, without inquiring into the subjective motivations of the officer.  *Graham*, 490 U.S., at 397-98.  The Fourteenth Amendment requires a higher threshold of proof (*i.e.,* shocks the conscience) than a claim under the Fourth Amendment; however, the legal theory depends on physical location of the person and whether probable cause has been determined.  Regardless, the question remains: was the use of force objectively justifiable?  Given the foregoing, we submit that the correct standard is under the Fourth Amendment.

At any rate, by the time of the constitutional violations occurred in April 2007, Rojas' Fourth and Fourteenth Amendment rights were clearly established in this Circuit as to the arresting officers and their supervisors.  *See, City of Canton,* 489 U.S., at 388; *Torraco,* 923 F.2d, at 234; *Jennings,* 499 F.3d, at 11; *Gutierrez-*

*Rodriguez*, 882 F.2d, at 561 (The causal connection alluded to by Sect. 1983 "can be established not only by some kind of [] personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."); *Springer v. Seaman*, 821 F.2d 871, 876 (1st Cir. 1987) (An actor is responsible for "those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties."); *Whitefield*, 431 F.3d, at 10.

Herein, deputies Perez and Rivera and sergeant Rodriguez were on notice that they had to provide medical care for the serious mental symptoms and safety needs of individuals under police custody and that they could not use deadly force when such individuals were restrained and presented no threat whatsoever. At the time of the arrest, by Defendants' own admissions, Rojas was disoriented, incoherent and exhibiting bizarre behavior to the point were Sgt. Rodriguez became concerned about his mental health and ordered the lower ranking officers to take him to a medical facility for urgent medical attention, but then he egregiously allowed them to veto his order and to take Rojas, instead, to the precinct in order to succumb to their primeval desires. Prior to arriving at the precinct, Rojas had no markings or evidence of bruising. Rojas was fully restrained -- handcuffed and shackled by the ankles – and placed in a holding cell. There, he received a severe beating, as evidence by the multiple bodily traumas

described in the autopsy report and reflected in the autopsy photographs, which caused his death. Where, as herein, the conduct at issue is such an obvious violation of the Constitution's general prohibition on excessive force, a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful. *Jennings*, 479 F.3d, at 125. Simply put, it was patently clear for Defendants that they could not recklessly disregard Rojas' diminished mental capacity and subject him to physical trauma the point of precipitating his death.

## **CONCLUSION**

For the foregoing reasons, this Honorable Court should vacate the District Court's Judgment and remand the case for further proceedings

RESPECTFULLY SUBMITTED. In San Juan, Puerto Rico, on this 6th day of April 2015.

**For Plaintiff/Appellants**

**S:/ JOSE F. QUETGLAS**
**JOSE F. QUETGLAS JORDAN**
Ct. of Appeals Bar No. 14338
jfquetglas@gmail.com

**S:/ PEDRO R. VÁZQUEZ**
**PEDRO R. VAZQUEZ**
Ct. of Appeals Bar No. 90552
Prvazquez3@gmail.com

## CERTIFICATE OF COMPLIANCE WITH  FED. R. APP. 32(a)(7)(B)

It is certified, pursuant to Fed. R. App. 32(a)(7)(B), that this Brief for the Appellant contains less that 14,000 words.  Excluding the table of contents, the table of authorities, corporate disclosure statements, addendum and attorney certificates, the Brief contains 13,613 words, in 14-point type face, Times New Roman.

## CERTIFICATE OF SERVICE

Today, we electronically filed the foregoing with the Clerk of the First Circuit of Appeals using the CM/ECF system which will send notification of such to the following attorneys of record:

It is certified that on this same date, two copies of the foregoing brief was delivered to each attorney of record at their following address by U.S. Mail:

I hereby certify that on April 6, 2015, a copy of this Brief has been sent to: **SUSANA I. PEÑAGARÍCANO-BROWN, ESQ.;** Assistant Solicitor General, Department of Justice, P.O. Box 9020192, San Juan, P.R. 00902-0192.  Plaintiffs-Appellants delivered the same by way of the U.S. Postal Service.

**For Plaintiff/Appellants**

QUETGLAS LAW
PO Box 16606
San Juan PR, 00908-6606
Tel: (787) 722-0635/722-7745
Fax: (787) 725-3970
jfquetglas@gmail.com

S:/ JOSE F. QUETGLAS
JOSE F. QUETGLAS JORDAN

57

Ct. of Appeals Bar No. 14338

**S:/ PEDRO R. VÁZQUEZ**
**PEDRO R. VAZQUEZ**
Ct. of Appeals Bar No. 90552
Prvazquez3@gmail.com

No. 14-1535

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

**NORMA IRIS MIRANDA-RIVERA; THE ESTATE OF CRISTOPHER ROJAS MIRANDA; NANCY I. TRINIDAD-TORRES**, on behalf of her minor child C.Y.R.T.
Plaintiffs - Appellants

GABRIEL ROJAS-PIRIS
Plaintiff

v.

**PEDRO TOLEDO-DAVILA**, Superintendent, Police of Puerto Rico;
**MIGUEL RODRIGUEZ-CRESPI**, Sergeant, Badge Number 8-11765;
**WILLIAM PEREZ-SOTO**, Police Officer, Badge Number 19273

Defendants - Appellees

ANIBAL ACEVEDO-VILA, Governor for the Commonwealth of Puerto Rico;
ROBERTO SANCHEZ-RAMOS, Secretary of Justice, Commonwealth of
Puerto Rico; ORLANDO RIVERA-LUGARDO; JUAN JOSE TOLEDO-
BAYOUTH; JOSE TOLEDO-BAYOUTH; FERNANDO TOLEDO-
BAYOUTH; PEDRO J. TOLEDO-BAYOUTH; JOHN DOE, Police Officer,
Toa Baja; INSURANCE COMPANY ABC, INC.; RICHARD ROE
Defendants

_____

### ADDENDUM TO PLAINTIFF/APPELLANTS' BRIEF

_____

# <u>TABLE OF CONTENTS</u>

1.   Docket 199: District Court's Opinion and Order dismissing complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1-41

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

|  |  |
|---|---|
| NORMA MIRANDA-RIVERA, ET AL., | |
| Plaintiffs, | |
| v. | Civil No.:08-1415 (DRD) |
| HON. PEDRO TOLEDO DÁVILA, ET AL., | |
| Defendant. | |

## <u>OPINION AND ORDER</u>

On April 9, 2012, Plaintiffs Nancy I. Trinidad Torres, on behalf of her minor child C.Y.R.T, as legal heir of Christopher Rojas Miranda (hereinafter, "Decedent" or "Rojas-Miranda"), and Norma Miranda, on her own and on behalf of her minor child J.L.M.,[1] filed a *Second Amended Complaint* (Docket No. 115) against the Hon. Pedro Toledo-Dávila, Sergeant Miguel Rodriguez Crespi, William Perez Soto, and Orlando Rivera-Lugardo (collectively, "Defendants")[2] alleging violations under the Fourth and Fourteenth Amendments of the United States Constitution; the Civil Rights Act of 1964, 42 U.S.C. § 1983;

---

[1] The only Plaintiff stating a federal cause of action under Section 1983 (in addition to the state law claims) is the minor child of Decedent, C.Y.R.T., for the alleged deprivation of Rojas-Miranda's federally protected rights under color of law (the inherited claim). Docket No. 115 at ¶¶ 6.1-6.4. Miranda and her minor son are only claiming damages under Puerto Rico's general tort statute. Miranda for her alleged personal damages and decedent's brother for his own pain and suffering. <u>Id.</u> at ¶¶ 9.1-9.5 and ¶¶ 10.1-10.3.

[2] On October 19, 2010, the Clerk entered default as to Defendant Orlando Rivera-Lugardo (Docket No. 91).

1

Article II, Sections 7, 8, and 10 of the Constitution of Puerto Rico; and Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141.

Pending before the Court is Defendants' *Motion for Summary Judgment* (Docket No. 146). Plaintiffs timely opposed said request for dismissal (Docket No. 159), Defendants replied (Docket No. 181), and Plaintiffs filed a surreply (Docket No. 185).[3]

The Court referred all pending motions to Magistrate Judge Camille L. Velez-Rive on October 16, 2013 (Docket No. 177), who entered a *Report and Recommendation* (Docket No. 190) on March 7, 2013. Therein, the Magistrate recommended that Defendants' *Motion for Summary Judgment* be granted in part and denied in part.

Specifically, the Magistrate found that Plaintiffs' claims for unreasonable search and seizure, excessive use of force during the arrest, and denial of urgent medical care warranted dismissal. However, the Magistrate concluded that issues of material fact preclude the entry of summary judgment as to Plaintiffs' claims for use of excessive force when the decedent was transported and incarcerated at the Toa Baja police station. The Magistrate further recommended that Plaintiffs' supplemental

---

[3]  Plaintiffs filed a *Motion in Limine* to exclude the testimony of Dr. Raul López and the new opinions rendered by Dr. Edda Luz Rodríguez (Docket No. 155). On February 20, 2014, the Magistrate Judge summarily **DENIED** said request (Docket No. 189).

000002

state law claims not be dismissed, finding issues of material
fact as to Plaintiffs' Section 1802 and 1803 claims. Lastly,
the Magistrate determined that Defendants were not entitled to
qualified immunity and that Plaintiffs had presented cognizable
claims against the supervisory Defendants.

On March 14, 2014, Defendants filed their objections to the
*Report and Recommendation* (Docket No. 192) averring, *inter
alias*, that the Magistrate Judge had erred in concluding that
issues of material fact persist as to whether Defendants used
excessive force when transporting and imprisoning the decedent.
Defendants contend that Plaintiffs' case rests solely on the
conclusions proffered by Dr. Adel Shaker, conclusions, which
they argue, ought to be disregarded.

On March 14, 2014, Plaintiffs also filed their objections
to the *Report and Recommendation* (Docket No. 193) contending,
*inter alias*, that they have established an actionable Fourth
Amendment claim for deliberate indifferent to Rojas' serious
medical needs.

## I. REFERRAL TO THE MAGISTRATE JUDGE

The Court may refer dispositive motions to a United States
Magistrate Judge for a Report and Recommendation pursuant to 28
U.S.C. §636(b)(1)(B). *See* FED. R. CIV. P. 72(b); *see also* Local
Rule 72(a); Matthews v. Weber, 423 U.S. 261, 96 S.Ct. 549
(1976). An adversely affected party may contest the

3

Magistrate's Report and Recommendation by filing its objections.
FED. R. CIV. P. 72(b).   Moreover, 28 U.S.C. §636(b)(1), in
pertinent part, provides that

> any party may serve and file written
> objections to such proposed findings and
> recommendations as provided by rules of
> court. A judge of the court shall make a *de
> novo* determination of those portions of the
> report or specified proposed findings or
> recommendations to which objection is made.
> A judge of the court may accept, reject, or
> modify, in whole or in part, the findings or
> recommendations made by the magistrate.

"Absent objection, . . . [a] district court ha[s] a right to
assume that [the affected party] agree[s] to the magistrate's
recommendation." Templeman v. Chris Craft Corp., 770 F.2d 245,
247 (1st Cir. 1985), *cert denied*, 474 U.S. 1021 (1985).
Additionally, "failure to raise objections to the Report and
Recommendation waives that party's right to review in the
district court and those claims not preserved by such objections
are precluded upon appeal." Davet v. Maccarone, 973 F.2d 22,
30-31 (1st Cir. 1992); *see* Henley Drilling Co. v. McGee, 36 F.3d
143, 150-51 (1st Cir. 1994) (holding that objections are
required when challenging findings actually set out in a
magistrate's recommendation, as well as the magistrate's failure
to make additional findings); *see also* Lewry v. Town of
Standish, 984 F.2d 25, 27 (1st Cir. 1993)(stating that
"[o]bjection to a magistrate's report preserves only those

4

objections that are specified"); <u>Borden v. Sec. of H.H.S.</u>, 836 F.2d 4, 6 (1st Cir. 1987)(holding that appellant was entitled to a de novo review, "however he was not entitled to a de novo review of an argument never raised").

The Court, in order to accept unopposed portions of the Magistrate Judge's Report and Recommendation, need only satisfy itself that there is no "plain error" on the face of the record. *See* <u>Douglass v. United Servs. Auto, Ass'n</u>, 79 F.3d 1415, 1419 (5th Cir. 1996)(*en banc*)(extending the deferential "plain error" standard of review to the un-objected to legal conclusions of a magistrate judge); *see also* <u>Nettles v. Wainwright</u>, 677 F.2d 404, 410 (5th Cir. 1982)(en banc)(appeal from district court's acceptance of un-objected to findings of magistrate judge reviewed for "plain error"); *see also* <u>Nogueras-Cartagena v. United States</u>, 172 F.Supp. 2d 296, 305 (D.P.R. 2001)(finding that the "Court reviews [unopposed] Magistrate's Report and Recommendation to ascertain whether or not the Magistrate's recommendation was clearly erroneous")(adopting the Advisory Committee note regarding FED.R.CIV.P. 72(b)); *see also* <u>Garcia v. I.N.S.</u>, 733 F.Supp. 1554, 1555 (M.D.Pa. 1990)(finding that "when no objections are filed, the district court need only review the record for plain error").

In the instant case, both parties have filed objections to the Magistrate Judge's *Report and Recommendation* (Docket Nos.

192 and 193). Thus, the Court reviews the portions of the *Report and Recommendation* to which objections were made *de novo* and reviews all other unobjected-to portions only for plain error.

After a careful analysis, the Court finds no "plain error" in the unobjected-to "Introduction" and "Relevant Findings of Fact" sections of the Magistrate Judge's *Report and Recommendation*. Thus, rather than repeating the procedural history and the set of facts that pertain to the instant case in their entirety, the Court hereby **ACCEPTS, ADOPTS AND INCORPORATES** by reference the Magistrate Judge's findings of fact *in toto*, noting particularly that they remain unchallenged.

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT MOTIONS

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be entered where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324-325 (1986). Pursuant to the clear language of the rule, the moving party bears a two-fold burden: it must show that there is "no genuine issue as to any material facts;" as well as that it is "entitled to judgment as a matter of law." <u>Veda-Rodriguez v.</u>

6

_Puerto Rico_, 110 F.3d 174, 179 (1st Cir. 1997).  A fact is "material" where it has the potential to change the outcome of the suit under governing law.  _See_ _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986).  A fact is "genuine" where a reasonable jury could return a verdict for the nonmoving party based on the evidence.  _Id._  Thus, it is well settled that "the mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment.  _Id._

 After the moving party meets this burden, the onus shifts to the non-moving party to show that there still exists "a trial worthy issue as to some material facts."  _Cortes-Irizarry v. Corporacion Insular_, 11 F.3d 184, 187 (1st Cir. 1997).

 At the summary judgment stage, the trial court examines the record "in the light most flattering to the non-movant and indulges in all reasonable references in that party's favor.  Only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment."  _Cadle Co. v. Hayes_, 116 F.3d 957, 959-60 (1st Cir. 1997).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  _Reeves v. Sanderson Plumbing Prod._, 530 U.S. 133, 150 (2000)(quoting _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 250-51, 106 S.Ct. 2505 (1986)).  Summary judgment is

inappropriate where there are issues of motive and intent as
related to material facts. *See* Poller v. Columbia Broad. Sys.,
369 U.S. 470, 473, 82 S.Ct. 486 (1962)(summary judgment is to be
issued "sparingly" in litigation "where motive and intent play
leading roles"); *see also* Pullman-Standard v. Swint, 456 U.S.
273, 288, 102 S.Ct. 1781 (1982)("findings as to design, motive
and intent with which men act [are] peculiarly factual issues
for the trier of fact."); *see also* Dominguez-Cruz v. Suttle
Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000)(finding that
"determinations of motive and intent . . . are questions better
suited for the jury").  "As we have said many times, summary
judgment is not a substitute for the trial of disputed factual
issues."  Rodríguez v. Municipality of San Juan, 659 F.3d 168,
178-179 (1st Cir. 2011)(internal quotations and citations
omitted).  Conversely, summary judgment is appropriate where the
nonmoving party rests solely upon "conclusory allegations,
improbable inferences and unsupported speculation."  Ayala-
Gerena v. Bristol Myers-Squibb Co., 85 F.3d 86, 95 (1st Cir.
1996).  However, while the Court "draw[s] all reasonable
inferences in the light most favorable to [the non-moving party]
. . . we will not draw *unreasonable* inferences or credit bald
assertions, empty conclusions or rank conjecture."  Vera v.
McHugh, 622 F.3d 17, 26 (1st Cir. 2010)(internal quotations and
citation omitted).  Moreover, "we afford no evidentiary weight

8

to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." <u>Tropigas De P.R. v. Certain Underwriters at Lloyd's of London</u>, 637 F.3d 53, 56 (1st Cir. 2011)(internal citations omitted).

Further, the Court will not consider hearsay statements or allegations presented by parties that do not properly provide specific reference to the record. *See* D.P.R. CIV. R. 56(e)("The [C]ourt may disregard any statement of fact not supported by a specific citation to the record material properly considered on summary judgment. The [C]ourt shall have no independent duty to search or consider any part of the record not specifically referenced."); *see also* <u>Morales v. Orssleff's EFTF</u>, 246 F.3d 32, 33 (1st Cir. 2001)(finding that, where a party fails to buttress factual issues with proper record citations, judgment against that party may be appropriate); <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990)("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").[4]

---

[4] D.P.R. CIV. R. 56(b), often referred to as the anti-ferret rule, requires the party moving for summary judgment to submit a "separate, short, and concise statement of material facts, set forth in numbered paragraphs, a s to which the moving party contends there is no genuine issue of material fact." Similarly, the non-moving party is required to submit a counter-statement "admit[ing], deny[ing] or qualify[ing]" the facts by reference to each numbered paragraph in the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by record citation." D.P.R. CIV. R. 56(c).

9

If a defendant fails to file an opposition to the motion for summary judgment, the district court may consider the motion as unopposed and disregard any subsequently filed opposition. Velez v. Awning Windows, Inc., 375 F.3d 35, 41 (1st Cir. 2004). Furthermore, the district court must take as true any uncontested statements of fact. Id. at 41-42; see D.P.R.R. 311.12; see Morales, 246 F.3d at 33 ("This case is a lesson in summary judgment practice …. [P]arties ignore [Rule 311.12] at their own peril, and … failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies deeming the facts presented in the movant's statement of undisputed facts admitted.")(internal citations and quotations omitted); see also Euromodas, Inc. v. Zanella , Ltd., 368 F.3d 11, 14-15 (1st Cir. 2004). However, this does not mean that summary judgment will be automatically entered on behalf of the moving party, as the court "still has the obligation to test the undisputed facts in the crucible of the applicable law in order to ascertain whether judgment is warranted." See Velez, 375 F.3d at 42.

### III. LEGAL ANALYSIS

### A. Section 1983 Claims

Section 1983 does not create any independent substantive rights; Section 1983 is only a procedural vehicle to vindicate constitutional and other federal statutory violations brought

10

about by state actors. *See* <u>Baker v. McCollan</u>, 443 U.S. 137, 145, n.3 (1979)("Section 1983 . . . is not itself a source of substantive rights, but [merely provides] a method for vindicating federal rights elsewhere conferred . . . ."); <u>Albright v. Oliver</u>, 210 U.S. 266 (1994); <u>Lockhart-Bembery v. Sauro</u>, 498 F.3d 69, 74 (1st Cir. 2007); <u>Cruz-Erazo v. Rivera-Montañez</u>, 212 F.3d 617 (1st Cir. 2000). Section 1983 merely provides a mechanism to remedy for deprivations of rights that are federally enshrined elsewhere, <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808 (1985), and applies to the Commonwealth of Puerto Rico with equal force. *See* <u>Deniz v. Mun. of Guaynabo</u>, 285 F.3d 142, 146 (1st Cir. 2002).

Section 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

42 U.S.C. § 1983.

When assessing the imposition of liability under Section 1983, we must first ask "(1) whether the conduct complained of was committed by a person acting under the color of state law; and (2) whether this conduct deprived a person of rights,

privileges, or immunities secured by the Constitution or laws of the United States." <u>Gutierrez-Rodriguez v. Cartagena</u>, 882 F.2d 553, 558 (1st Cir. 1989)(citing <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981)). Acting under color of state law requires that a "defendant in § 1983 action have exercised power possessed by virtue of state law and made possible only because wrongdoer is clothed with authority of state law." <u>West v. Atkins</u>, 487 U.S. 42, 49 (1988).

In the instant matter, all of the facts alleged by Plaintiffs transpired under the umbrella of the Puerto Rico Police Department ("PRPD"), a governmental instrumentality of the Commonwealth of Puerto Rico. At all relevant times, Defendants were employed by the Commonwealth of Puerto Rico and acting in their official capacities, as the alleged constitutional violations occurred while Defendants were exercising their duties as police officers. Therefore, Section 1983 is an appropriate avenue to remedy the alleged conduct that supposedly deprived Plaintiffs of their "rights, privileges, and immunities" protected under the Constitution.

Although Section 1983 provides an avenue to remedy many deprivations of civil liberties in federal court, it "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989). The

12

Eleventh Amendment bars lawsuits for monetary damages against a State in federal court, unless said State has waived its immunity or unless Congress has expressly overridden that immunity. *See* CONST. Amend. XI; <u>Will</u>, 491 U.S. at 66 (citing <u>Welch v. Texas Dept. of Highways and Public Transportation</u>, 483 U.S. 468, 472-473 (1987) (plurality opinion)); <u>O'Neill v. Baker</u>, 210 F.3d 41 (1st Cir. 2000). Furthermore, "neither a state agency nor **a state official acting in his official capacity may be sued for damages in a section 1983 action.**" <u>Johnson v. Rodriguez</u>, 943 F.2d 104, 108 (1st Cir. 1991)(emphasis ours). The reasoning follows that a suit against an official actor is a suit against his office, and by default a suit against the state. *See* <u>Will</u>, 491 U.S. at 71; <u>Brandon v. Holt</u>, 469 U.S. 464, 471 (1985); <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-166 (1985).

Puerto Rico has long been considered a state for Eleventh Amendment purposes. *See* <u>Irizarry-Mora v. Univ. of Puerto Rico</u>, 647 F.3d 9 (1st Cir.2011); <u>Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth.</u>, 991 F.2d 935 (1st Cir.1993). "The Eleventh Amendment bars the recovery of damages in a federal court against the Commonwealth of Puerto Rico, and, by the same token, it bars the recovery of damages in *official capacity* suits brought against Puerto Rico officials where recovery will come from the public fisc." <u>Culebras Enterprises Corp. v. Rivera Rios</u>, 813 F.2d 506, 516 (1st Cir.1987) (citing <u>Ramirez v. P.R.</u>

13

<u>Fire Service</u>, 715 F.2d 694, 697 (1st Cir.1983) and *Kentucky v. Graham,* 473 U.S. 159 (1985)) (emphasis in the original); <u>Maysonet-Robles v. Cabrero</u>, 323 F.3d 43 (1st Cir.2003).

In the instant matter, Plaintiffs are only seeking monetary damages from Defendants.[5] However, Puerto Rico and its agencies are not considered "persons" under Section 1983, and thus, cannot be held liable for monetary damages in their official capacities. The Commonwealth has not expressly waived its Eleventh Amendment immunity in the case at bar, and, as Defendants correctly argue, a judgment against Defendants in their official capacities is a judgment against the Commonwealth and the Commonwealth would end up paying for it. Accordingly, the Court hereby **DISMISSES WITH PREJUDICE** all Section 1983 claims against Defendants in their official capacity and against the Commonwealth of Puerto Rico for monetary damages. We now proceed to analyze each constitutional violation alleged by

---

[5]  Prospective injunctive relief as an equitable remedy against defendants in their official capacity is not barred by the Eleventh Amendment, pursuant to <u>Ex Parte Young</u>, 209 U.S. 123 (1908), to end a "continuing violation of federal law." <u>Mills v. State of Me.</u>, 118 F.3d 37, 54 (1st Cir. 1997)(citing <u>Green v. Mansour</u>, 474 U.S. 64, 68 (1985)). In <u>Mills</u>, the First Circuit stressed that "the doctrine of *Ex parte Young* ... allows plaintiffs to avoid the Eleventh Amendment bar by naming a state officer **in his official capacity** in cases where prospective declaratory and injunctive relief is sought." <u>Id.</u> at 53 (emphasis ours). Nevertheless, Plaintiffs do not seek prospective injunctive relief against Defendants in the case at bar.

14

Plaintiffs against Defendants in their personal capacities for monetary damages.[6]

### a) Fourth Amendment: Probable Cause and Excessive Use of Force

*Probable Cause*

At the outset, Plaintiffs aver that Defendants Pérez and Rivera lacked probable cause to arrest the decedent on the night of April 10, 2007, thereby subjecting Rojas-Miranda to unreasonable searches and seizures under the Fourth Amendment. Conversely, Defendants argue that the arresting officers had firsthand knowledge that the decedent had violated numerous traffic laws, having observed Rojas-Miranda driving over the speed limit and running a red light before nearly colliding with another vehicle.

The Magistrate Judge determined, and the Court agrees, that the arresting officers had probable cause to detain and subsequently arrest the decedent on April 10. The Magistrate reasoned that the officers had observed the decedent speed through a red light and act suspiciously upon being stopped. For the reasons elucidated below, the Court concurs with the Magistrate Judge's findings and holds that the arresting

---

[6] Additionally, the Court hereby **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims against three unnamed Defendants who purportedly aided and abetted in committing the civil rights violations, noting that Plaintiffs have had six years to locate said defendants. *See* Fed. R. Civ. P. 4(m); <u>Mulero Abreu v. Oquendo Rivera</u>, 729 F. Supp. 2d 498, 511 (D.P.R. 2010).

000015

officers had probable cause to detain and subsequently arrest the decedent.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ... and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

An officer may conduct an arrest, without a warrant, where the officer has probable cause to believe that the arrestee has committed a felony and the arrest occurs in a public place or otherwise used for public purposes. *See* United States v. Parker, 549 F.3d 5, 8 (1st Cir. 2008) ("Outside the home, the police can arrest without a warrant anyone who they have probable cause to believe committed a felony.")(citing Carroll v. United States, 267 U.S. 132, 156 (1925) and United States v. Watson, 423 U.S. 411 (1976)). "Probable cause exists when reasonably prudent police officers, under the facts and circumstances, would believe the defendant had committed or was about to commit a crime." United States v. Gonzalez, 609 F.3d 13, 19 (1st Cir. 2010); *see* United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000)(Courts must look at the totality of the circumstances when deciding whether there was probable cause for arrest).

Case: 3:14-cv-01415-DRD Document 198 Filed: 08/30/2013 Page 17 of 51 5898053

In the case at bar, Officers Pérez and Rivera were working the 8:00 PM to 4:00 AM shift on car patrol.  At around 8:15-8:20 PM, both agents noticed a speeding vehicle run a red light and almost collide with another vehicle in the process.   The officers initiated pursuit, but the driver nonetheless continued speeding through traffic lights, driving in and out of the shoulder lane in the process.   Suddenly, the driver of the vehicle, later identified as Rojas-Miranda, brought the car to a complete stop between Road No. 2 and a side road in front of the Covandonga Urbanization in Toa Baja.   At this time, the officers proceeded to call the police command center to verify information regarding the vehicle's license plate.   Noelia Quiñones Jimenez, the desk officer at the Police Station in Toa Baja, indicated that the call came in at approximately 8:30 PM.

After verifying the vehicle's license plate, Officer Pérez approached the decedent's car and observed a nervous and sweaty male driver acting suspiciously.   The driver appeared to be looking all over the place.   For precautionary measures, the officers instructed the driver to exit the vehicle and place his hands on the truck of the car.   Approximately twenty individuals had gathered near the scene to obtain a closer look at what was transpiring.   When the police officers approached the decedent, he became agitated and began screaming "why is that vehicle chasing me, why is it chasing me."   Officer Pérez then proceeded

17

to grab his handcuffs in an attempt to apprehend and place the decedent under arrest. However, when Officer Pérez attempted to place the decedent under arrest, the decedent inadvertently threw a wild blow with his hand, knocking Officer Rivera's portable radio to the ground in the process. While this was occurring, Rojas-Miranda continued screaming coarse words and reiterating that he was being followed.

The Court agrees with the Magistrate that, based on the totality of the circumstances, the arresting officers had probable cause to arrest the decedent, stressing that the officers not only observed Rojas-Miranda violate numerous traffic laws, but also witnessed his suspicious and erratic behavior following the traffic stop. Thus, a reasonably prudent police officer under the same or similar circumstances would have believed that there was probable cause to arrest Rojas-Miranda. Accordingly, Plaintiffs' Fourth Amendment claim for unreasonable searches and seizures is hereby **DISMISSED WITH PREJUDICE.**

*Excessive Force*

Although it is uncontested that the arresting officers did not use excessive force at the time of the arrest,[7] Plaintiffs nonetheless aver that Defendants used excessive force when

---

[7] *See* Plaintiffs' SUF (Docket No. 160, at ¶31)("It is only admitted that the members of the Police Force used the necessary force to immobilize or restrain Christopher Rojas at the scene of the arrest.")

000018

transporting and incarcerating the decedent at the Toa Baja
police station. Defendants strenuously object to this
accusation, emphasizing that there is not a scintilla of factual
evidence on the record supporting Plaintiffs' contention.

"In addressing an excessive force claim brought under §
1983, analysis begins by identifying the specific constitutional
right allegedly infringed by the challenged application of
force." Graham v. Connor, 490 U.S. 386, 394 (1989). In the
majority of excessive use of force cases, the specific
constitutional rights normally fall under the Fourth Amendment's
prohibition against unreasonable seizures or the Eighth
Amendment's ban on cruel and unusual punishments. Id. However
the Eighth Amendment only applies to excessive force claims
brought forth by convicted criminals currently serving their
sentences. Whitley v. Albers, 475 U.S. 312, 318-322 (1986).

Although the law is clear that claims for excessive use of
force by an *arresting* police officer are analyzed under the
Fourth Amendment's "objective reasonableness" standard, the
Supreme Court deliberately left undecided whether the Fourth
Amendment continues to apply "beyond the point at which arrest
ends and pretrial detention begins...." Graham, 490 U.S. at 395
n.10.[8] As a result, "a circuit split has emerged from this legal

---

[8] The Magistrate Judge was quick to conclude that the decedent's rights were
protected under the Fourth Amendment, citing Estate of Bennett v.
Wainwright, 548 F.3d 155 (1st Cir. 2008) and Torres-Rivera v. O'Neill-Cancel,

'twilight zone,' with courts choosing between the Fourth Amendment and the Fourteenth Amendment to protect those arrested without a warrant between the time of arrest and arraignment." Aldini v. Johnson, 609 F.3d 858, 864 (6th Cir. 2010)(citing Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000)).[9]

The majority of circuits have held that the Fourth Amendment protects individuals arrested without a warrant until such time as they appear before a magistrate for arraignment or a judicial determination of probable cause has been made. *See* Currie v. Chhabra, 728 F.3d 626, 629-30 (7th Cir. 2013)("The Fourth Amendment governs the period of confinement between arrest without a warrant and the probable cause determination.")(internal citations and quotations omitted); Aldini, 609 F.3d at 860 (6th Cir.); Pierce v. Multnomah Cnty., 76 F.3d 1032, 1043 (9th Cir. 1996); Powell v. Gardner, 891 F.2d 1039, 1044 (2d Cir. 1989); Wilson v. Spain, 209 F.3d 713, 715-16 (8th Cir. 2000); Barrie v. Grand County, 119 F.3d 862, 866 (10th Cir. 1997); *see generally* Catherine T. Struve, The Conditions of

---

406 F.3d 43, 51-53 (1st Cir. 2005). However, the Court clarifies that the alleged excessive use of force in both Wainwright and Torres-Rivera transpired before the individuals had been arrested, which is not the case here.

[9]  Whether the Fourth Amendment or the Fourteenth Amendment applies could be outcome determinative, as the standards of liability for these causes of action vary widely. *Compare* Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010)(finding that excessive force cases under the Fourth Amendment are analyzed "according to the constitutional touchstone of objective reasonableness, so [courts] do not consider an officer's subjective 'intent or motivation'"), *with* County of Sacramento v. Lewis, 523 U.S. 833 (1998)(excessive force claims under the Fourteenth Amendment must satisfy the "shocks the conscience" test).

000020

Pretrial Detention, 161 U. Penn. L.Rev., 1009, 1013 (2013)(The Fourth Amendment governs "the treatment of arrestees until there has been a judicial determination of probable cause."). Conversely, a minority of circuits hold that substantive due process protects individuals after being arrested but before being arraigned, emphasizing that the Fourth Amendment becomes irrelevant once an individual is placed under arrest. *See* Riley v. Dorton, 115 F.3d 1159, 1161-64 (4th Cir.); Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996).

Although some courts have struggled to define when exactly pretrial detention begins, we find that the Supreme Court's language in Bell v. Wolfish, 441 U.S. 520, 535-539 (1979), clearly sheds light on said issue. In Wolfish, the Court determined that the Due Process Clause applies to the conditions of "pretrial detention" when "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Id. at 535 (internal citations omitted). The Court went on to explain that an individual lawfully committed to "pretrial detention" has not been found guilty of any crimes, but "has had only a **judicial determination of probable cause** as a prerequisite to the extended restraint of his liberty following arrest." Id. (quoting Gerstein v. Pugh, 420 U.S. 103, 114 (1975))(internal quotations omitted). Thus, the Court's findings in Wolfish clearly stand for the proposition that

21

"pretrial detention," giving rise to the applicability of the
Due Process Clause, does not begin until a judicial
determination of probable cause has been effected. As such, the
Court agrees with the Second, Sixth, Seventh, Eighth, Ninth, and
Tenth circuits in holding that the Fourth Amendment protects
individuals who have been arrested without a warrant but have
not had a probable cause hearing.

Because the standards of liability under the Fourth and
Fourteenth Amendments vary widely, it is imperative for the
Court to first determine the legal status of Rojas-Miranda at
the time of the alleged incident in order to determine which
constitutional amendment applies. Plaintiffs posit that
Defendants used excessive force from the time that the decedent
was placed in the police cruiser to the time of his death at the
police station less than one hour and ten minutes later. Rojas-
Miranda was arrested without a warrant, meaning that the
decedent had not been accorded a judicial probable cause
determination, thereby triggering the Due Process Clause. As
such, the decedent's status was that of the type contemplated by
the Supreme Court in Graham, an individual who was subjected to
a warrantless arrest but has yet to become a pretrial detainee.
See Graham, 490 U.S. at 395 n.10.

Excessive force claims under the Fourth Amendment are
analyzed under the "objectively reasonable" standard, meaning

22

000022

that the arresting officer's subjective intent or motivation is
not considered.  *See* Id.; Raiche, 623 F.3d at 36.   In
determining whether the force used by the officer was
reasonable, courts must carefully balance "'the nature and
quality of the intrusion on the individual's Fourth Amendment
interests' against the countervailing governmental interests at
stake." Graham, 490 U.S. at 396 (quoting Tennessee v. Garner,
471 U.S. 1, 8 (1985)).  Excessive force cases require courts to
pay careful attention to the facts and circumstances regarding
the alleged incident, including, but not limited to, the threat
posed by the suspect to the officers and others and whether the
suspect is resisting arrest.  *See* Id.; Raiche, 623 F.3d at 36;
Morelli v. Webster, 552 F.3d 12, 23 (1st Cir. 2009).  Further,
the reasonableness of the officer's conduct must be judged
through the lens of a "reasonable officer on the scene, rather
than with the 20/20 vision of hindsight." Graham, 490 U.S. at
396 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).

Turning to the facts before us, the Court finds that,
looking at the evidence in the light most favorable to the non-
moving party, no reasonable jury could conclude that the
Defendants used excessive force against the decedent,
accentuating that empty rhetoric and unsupported speculations
are insufficient to make out a triable issue of fact at this
stage of the proceedings. *See* Tropigas De P.R., 637 F.3d at 56.

23

000023

For the foregoing reasons, Plaintiffs' Fourth Amendment claims for excessive use of force are hereby **DISMISSED WITH PREJUDICE.**

According to Nancy Trinidad Torres, the mother of the decedent's only child, Rojas-Miranda had be using cocaine for at least one year before his death, and had refused to go to rehabilitation. Whenever he was under the influence of drugs, he would become nervous, with a sense of persecution, and would begin to hallucinate. Trinidad Torres indicated that the decedent would become aggressive and would believe that people were following him. On April 10, 2007, the decedent left his house between 7:00PM-7:30PM to buy refreshments. Sometime before leaving the house, Rojas-Miranda was under the influence of drugs.

The uncontested facts show that after being placed under arrest,

> three agents proceeded to put Rojas-Miranda inside the patrol car given that he was actively resisting being put inside the vehicle and continued screaming. SUM ¶ 37. When Sgt. Rodríguez-Crespi arrived, the individual was already handcuffed and in the patrol car screaming coarse words and screaming that he was being followed and that he was going to be murdered. Sgt. Rodríguez Crespi looked inside the patrol vehicle and saw that the individual was sweating with a violent and aggressive look. SUM ¶ 38. Sgt. Rodríguez-Crespi was not at the scene for more than ten minutes. SUM ¶ 39. Sgt. Rodríguez-Crespi told the agents that seeing that this person was so violent they could take him to the CDT. SUM ¶ 40. Rivera-Lugardo told Sgt. Rodríguez-Crespi that given how violent and aggressive the individual was and his size, an incident could be provoked at the CDT where

> other people could be put at risk. He then said that
> the more viable alternative was to take him to the
> police station. SUM ¶ 41. Sgt. Rodríguez-Crespi
> agreed with Rivera-Lugardo because a problem could be
> prevented at the CDT. SUM ¶ 42. Both Pérez- Ortiz
> and Rivera-Lugardo got in the patrol car and drove to
> the Toa Baja police station. All the while the male
> driver kept on screaming inside the vehicle. SUM ¶
> 44. At all times while taking Rojas-Miranda out of the
> patrol vehicle, he kept on screaming, being aggressive
> and violent and stating that someone was following
> him, that they wanted to kill him. SUM ¶ 53. At
> their arrival at the station, only desk officer
> Quiñones and a civilian were at the station. SUM ¶
> 54.

Docket No. 190, at 10-11. The evidence further shows that Rojas-Miranda continued to act in a belligerent manner, going so far as to place his legs against the door of the holding cell in an effort to prevent the police officers from placing him inside. [10] Once inside the cell, the decedent began kicking his legs wildly, forcing the arresting officers to grab him by the pants and place him face down on the floor.[11] When Rojas-Miranda refused to calm down, the officers placed "tie wraps" around his ankles in an effort to immobilize him. Unfortunately, Sanchez-Rojas was pronounced dead approximately twelve minutes after being placed in the holding cell.

The Fourth Amendment requires that we balance the nature of the intrusion with the countervailing government interests at

---

[10] Plaintiffs object to this factual assertion, arguing that said statement is self-serving and mischaracterizes the facts. However, Plaintiffs failed to properly support its objection by adequately citing to facts on the record.

[11] In a similar fashion, Plaintiffs also object to this factual finding, but once again fail to support their objection with a proper record citation.

stake.  *See* <u>Graham</u>, 490 U.S at 396.  Analyzing the facts in the
case at bar under the "objective reasonableness" standard, the
Court finds that the arresting officers used reasonable force
under the circumstances.  The evidence shows, and Plaintiffs
readily admit, that the decedent was behaving in an erratic
manner both when he was placed in the police vehicle and when he
arrived at the police station in Toa Baja.  When they arrived at
the station, the decedent was aggressive and screaming, doing
everything within his power to avoid being locked in the holding
cell.  It was only after Rojas-Miranda began kicking that the
arresting officers used force to not only protect themselves but
to restrain him.  The Court stresses that "the use of force is
an expected, necessary part of a law enforcement officer's task
of subduing and securing individuals suspected of committing
crimes."  <u>Jennings v. Jones</u>, 499 F.3d 2, 11 (1st Cir.
2007)(internal quotations and citations omitted).

In support of their proposition that the arresting officers
used excessive force against Rojas-Miranda, Plaintiffs rely on
the testimony of Dr. Adel Shaker, a forensic pathologic.  Dr.
Shaker determined that the decedent died from extensive blunt
force trauma to the head and trunk as a result of "extensive non
accidental inflicted trauma to his body while he was constrained
by handcuffs and shackles in police custody."  Docket No. 161-5,
at 7.  According to Plaintiffs, Dr. Shaker's conclusion that

26

Rojas-Miranda died from extensive non accidental trauma is
sufficient to create an issue of material fact as to whether the
arresting officers used excessive force.[12]

Defendants counter that Plaintiffs cannot create an issue
of material fact by simply relying on the unsubstantiated and
unfounded conclusions of their medical expert. Defendants aver
that Dr. Shaker's opinion should be completely disregarded by
the Court, as his conclusions are both unsupported by the record
and completely unsubstantiated.

"[I]n order to defeat a motion for summary judgment an
expert opinion must be more than a conclusory assertion about
ultimate legal issues." Hayes v. Douglas Dynamics, Inc., 8 F.3d
88, 92 (1st Cir. 1993) (citing Bowen v. Manchester, 966 F.2d 13,
n. 16 (1st Cir. 1992)). Simply stated, an expert opinion
containing nothing but conclusions, "no facts, no hint of an
inferential process, no discussion of hypotheses considered and
rejected," will be insufficient to defeat summary judgment. Id.
(internal quotations and citations omitted). Thus, an expert
report must contain, at a minimum, "the factual basis and the

---

[12] Plaintiffs repeatedly highlight that Sgt. Rodríguez ordered all of the
other police officers out of the station in an effort to create issues of
material fact as to what transpired after everyone left the station.
Nevertheless, the Court notes, without making credibility determinations,
that Sgt. Rodríguez's deposition transcript explains that the decedent was
already in the holding cell when he instructed the fellow police officers to
return to the field.

000027

process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment." Id.

Upon conducting a thorough review of Dr. Shaker's medical report, the Court finds that said report, coupled with all of the evidence on the record, is insufficient to defeat summary judgment on the excessive use of force claim. Dr. Shaker's report does not provide a factual basis for his opinion nor does it discuss or consider any other potential hypothesis. In essence, what Dr. Shaker did was summarize all of the decedent's injuries and then jump straight to his conclusion that said injuries were non-accidental. He failed to explain why the injuries described were inconsistent with the injuries suffered by the decedent during his fall at the time of the arrest and why the trauma in his head was inflicted while he was in police custody and not by the concrete surface he impacted a short time before passing away. Plaintiffs' reliance on a bare ultimate expert conclusion is insufficient, coupled with all of the evidence on the record, to create a triable issue of fact as to the excessive use of force claim.

In sum, the evidence on the record shows that the arresting officers acted objectively reasonable under the circumstances, particularly given that the decedent was resisting arrest and acting in a violent manner when they arrived at the police station. Police officer may use reasonable force when

attempting to subdue a belligerent and violent arrestee, and the uncontested facts on the record show that the officers did just that. Plaintiffs' rely solely on the opinions rendered by Dr. Shaker, but, as the Court previously explained, Dr. Shaker's medical report is replete with unsubstantiated conclusions. Specifically, Dr. Shaker determined that the decedent's cause of death was the result of non-accidental inflicted trauma to his head and trunk, but fails to explain the factual basis and the process of reasoning necessary to defeat a motion for summary judgment.

Accordingly, the Court finds that no reasonable juror could conclude that the arresting officers' conduct was objectively unreasonable. Hence, Defendants' *Motion for Summary Judgment* (Docket No. 146) as to the excessive use of force claim is hereby **GRANTED**.

### b) Fourteenth Amendment: Denial of Medical Care

The Due Process Clause of the Fourteenth Amendment requires police officers to provide medical care to individuals who have been injured while being apprehended. City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). Although the Supreme Court has yet to specifically define the "boundaries of this duty," the law is clear that "they extend at least as far as the protection that the Eighth Amendment gives to convicted

29

prisoners.  <u>Gaudreault v. Munic. of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990)(citing <u>City of Revere</u>, 463 U.S. at 244)).

Under the Eighth Amendment, government officials have a duty to attend to a prisoner's "serious medical needs," violating the Constitution if they are deliberately indifferent to such needs.  <u>Id.</u> (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)).  A "serious medical need" is one that: (1) has been diagnosed by a physician as mandating treatment or (2) is so obvious that even a lay person would easily recognize the need for medical attention.  <u>Id.</u> (citing <u>Monmouth County Correctional Institutional Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3rd Cir. 1987)).

In the instant matter, Plaintiffs posit that Defendants exhibited deliberate indifference to the decedent's medical needs.  Specifically, Plaintiffs argue that Pérez, Rivera, and Sgt. Rodríguez-Crespi should have taken Rojas-Miranda to the hospital immediately after his arrest, particularly given the fact that he was exhibiting diminished mental capacity at the time of the arrest.  Contrariwise, Defendants aver that they attempted to provide the decedent with medical treatment as swiftly as possible, emphasizing that Rojas-Miranda's violent and aggressive behavior weighed heavily against transporting him to a medical facility.

The evidence on the record demonstrates that immediately after falling down and being placed under arrest, the decedent acknowledged to Officer Pérez that he was fine. Nevertheless, Rojas-Miranda continued to behave in a belligerent and delusional manner, stressing that people were following him. It was 8:40 PM when the arresting officers called dispatch for assistance. After being placed in the patrol vehicle, the decedent continued screaming coarse words and reiterating that people were out to murder him. Sgt. Rodríguez-Crespi suggested that the decedent be transported to an urgent care facility to get treated for the injuries sustained from the fall. However, Officer Rivera recommended that the decedent be transported to the police station instead, accentuating that an incident could be provoked at the urgent care facility given Rojas-Miranda's violent state, thereby placing patients and medical personnel at risk. Sgt. Rodríguez-Crespi agreed.

At 9:38 PM, paramedics Daramis Ayala Mélendez and Mirelsa Esquilín received a call from the police desk officer requesting medical assistance for the decedent. According to Defendant Pérez, the decedent's temple and front part of the head started turning purplish. It was then that he ordered the desk officer to place a second call to the paramedics. The paramedics arrived at the station at 9:48 PM, ten (10) minutes after the first call was placed and right as the desk officer was about to

31

place a third call. As the Magistrate Judge correctly indicated, no more than one hour and ten minutes transpired from the moment Officer Pérez placed the back-up call to the time Rojas-Miranda was pronounced dead.

We agree with the Magistrate that there is not a scintilla of evidence on the record showing "deliberate indifference" on behalf of the Defendants. The police officers made a judgment call to transport the decedent back to the police station and provide him with medical treatment there as opposed to taking him to an urgent care center. The physical and medical evidence demonstrates that the decedent was more likely than not under the influence of narcotics at the time of his arrest, thereby explaining his aggressive and irrational behavior. Trinidad Torres testified that the decedent had been using cocaine for about one year before his death and that he had been under the influence of drugs shortly before leaving his house on the night of April 10th. Trinidad Torres further indicated that Rojas-Miranda would not only become aggressive when high, but would also hallucinate, thinking that someone was following him. Additionally, and of the outmost importance, is the fact that the decedent had traces of both the mother substance of cocaine and its principle metabolite (benzoleicgonine) in his blood

32

stream at the time of his death.[13]  Taking all of this evidence in conjunction, it is patently clear that the decedent was more likely than not under the influence of drugs at the time of his arrest, as he was exhibiting all of the symptoms described by both Trinidad Torres and Dr. Rodríguez Morales before, during, and after his arrest.

Furthermore, at the time of the arrest, the decedent did not have a medical need so obvious that even a lay person would easily recognize the need for medical attention.  José Manuel Candelaria-Rivera, an eyewitness to the stop and the arrest, acknowledged that the only injury he could observe on the decedent was a small cut in his lips.

Moreover, and most important, is the fact that the arresting officers did not attempt to deny Rojas-Miranda medical treatment, summoning an ambulance to the police station as soon as the decedent was placed in the holding cell.  In fact, once the officers noticed that Rojas-Miranda's physical condition was deteriorating, a second call to the paramedics was placed.  As the Magistrate Judge succinctly put it, "summary judgment is appropriate when there is no evidence that a plaintiff received treatment 'so inadequate as to shock the conscience.'"  *See*

---

[13] Dr. Edda Luz Rodríguez Morales, the forensic pathologist who conducted the decedent's autopsy, concluded that the decedent's cause of death was cocaine intoxication.  She explained that cocaine, when used chronically, can cause insomnia, paranoia and hallucinations.

000033

Docket No. 190, at 33 (citing <u>Torraco v. Maloney</u>, 923 F.2d 231, 234 (1st Cir. 1991)). Accordingly, Defendants' *Motion for Summary Judgment* (Docket No. 146) as to the denial of medical care is hereby **GRANTED**.[14]

### B. QUALIFIED IMMUNITY DEFENSE

The "doctrine of qualified immunity protects government officials from [personal] liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). This is to say that the Court must find that "[p]ublic officials are . . . entitled to qualified immunity *unless* the facts establish that their conduct violated a constitutional right that was clearly established at the time of the violation such that a reasonable officer would have known that the conduct at issue was unlawful." <u>Whitfield v. Melendez-Rivera</u>, 431 F.3d 1, 6 (1st Cir. 2005)(internal quotations omitted)(emphasis in

---

[14]  The Court elaborates that any claims against the late Pedro Toledo Dávila and Sgt. Rodríguez-Crespi under the theory of *respondeat superior* are hereby **DISMISSED WITH PREJUDICE**, as Section 1983 does not impose supervisory liability against individuals who were not directly involved in the wrongdoing. *See* <u>Rizzo v. Goode</u>, 423 U.S. 362, 375-77 (1976); <u>Martínez-Vélez v. Rey Hernández</u>, 506 F.3d 32, 41 (1st Cir. 2007). Plaintiffs' *Second Amended Complaint* imputes liability on both Pedro Toledo and Rodríguez-Crespi "because their conduct reflected a reckless or callous indifference to the decedent's rights." Docket No. 115, at 2. Nevertheless, Plaintiffs claims against said individuals must be dismissed, as Plaintiffs not only neglected to support said bare bone allegation with factual averments in the complaint, but also failed to produce any affirmative evidence after the conclusion of discovery to said effect. *See* <u>Sanchez v. Pereira-Castillo</u>, 590 F.3d 31, 41 (1st Cir. 2009)("[I]n order to survive a motion to dismiss, [a] plaintiff must allege sufficient facts to show that he has a plausible entitlement to relief.").

000034

the original). "The protection of qualified immunity applies
regardless of whether the government official's error is a
mistake of law, a mistake of fact, or a mistake based on mixed
questions of law and fact." Pearson v. Callahan, 555 U.S. 223,
129 S.Ct. 808, 815 (2009). Thus, "[w]hile an official has a
presumptive knowledge of constitutional standards, he or she is
not expected to determine the manner in which the law's grey
areas will be clarified and defined." Lane v. First Nat'l Bank
of Boston (Lane I), 587 F.Supp 11, 16 (1st Cir. 1988).

Although, in the past, courts in this Circuit and in most
other Circuits had analyzed the application of qualified
immunity in a three-part test, the current qualified immunity
analysis espoused by the Supreme Court entails only two steps.
See id. (applying the two-step analysis applied after Pearson v.
Callahan, 555 U.S. 223, 129 S.Ct. 808, 818 (2009)); see also
Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)
(clarifying that the second step of the two-step inquiry
essentially compresses two prongs of the previous three-step
inquiry). Thus, under the presently applicable inquiry, in
order "[t]o determine whether a particular officer is entitled
to qualified immunity, a court must decide: (1) whether the
facts alleged or shown by the Plaintiff make out a violation of
a constitutional right; and (2) if so, whether the right was
clearly established at the time of the defendant's alleged

35

violation." Estrada v. Rhode Island, 594 F.3d 56, 62-63 (1st Cir. 2010). In the wake of Pearson, either step of the two-step analysis may become the launching pad for the Court's analysis; strict adherence to a sequential qualified immunity analysis is no longer necessary. Macdonald v. Town of Eastham, __ F.3d __, 2014 WL 944707 (1st Cir. March 12, 2014); Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).

The second step, in turn, has two aspects. Id. First, the Court must analyze whether "the contours of the right [were] sufficiently clear [so] that a reasonable official would understand that what he [did] violate[d] that right." Maldonado, 568 F.3d at 269 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987)). The second aspect for the Court's consideration is "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights" in the situation with which the defendant was confronted. Id. This is to say that "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." Id. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815 (2009).

36

Turning to the facts in the case at hand, the Court holds that Defendants are entitled to qualified immunity, finding that the facts alleged or shown by the Plaintiffs fail to make out a violation of a constitutional right. We briefly explain, incorporating by reference our prior analysis on both the Fourth and Fourteenth Amendments.

*Fourth Amendment: Excessive Use of Force*

As discussed above, excessive force claims under the Fourth Amendment are analyzed under the "objectively reasonable" standard. *See* <u>Graham</u>, 490 U.S. at 395 n.10.; <u>Raiche</u>, 623 F.3d at 36. In determining whether the force used by the officer was reasonable, courts must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." <u>Graham</u>, 490 U.S. at 396 (quoting <u>Tennessee v. Garner</u>, 471 U.S. 1, 8 (1985)). Thus, courts must pay careful attention to the facts and circumstances regarding the alleged incident, including, but not limited to, the threat posed by the suspect to the officers and others and whether the suspect is resisting arrest. *See* <u>Id.</u>; <u>Raiche</u>, 623 F.3d at 36; <u>Morelli v. Webster</u>, 552 F.3d 12, 23 (1st Cir. 2009). Further, the reasonableness of the officer's conduct must be judged through the lens of a "reasonable officer on the scene, rather than with the 20/20

37

vision of hindsight." Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).

In the instant matter, the arresting officers acted reasonably under the circumstances, using only the necessary force to control the decedent from the time of his arrest to when he passed away approximately one (1) hour and (10) minutes later. Plaintiffs contend that the arresting officers beat-up the decedent, killing him in the process. Nevertheless, the record paints a different picture, one showing that Rojas-Miranda was acting violently and belligerently before, during, and after his arrest, and that the arresting officers used only the necessary force in subduing and placing Rojas-Miranda inside the holding cell. The record is devoid of any evidence, direct or circumstantial, that any one of the arresting officers savagely beat the decedent. As such, **Defendants are entitled to qualified immunity** on Plaintiffs' Fourth Amendment excessive use of force claims.[15]

*Fourteenth Amendment: Denial of Medical Care*

The Due Process Clause of the Fourteenth Amendment requires police officers to provide medical care to individuals who have been injured while being apprehended. City of Revere v. Mass.

---

[15] The Court notes that Defendants could also be entitled to qualified immunity on the grounds that the decedent's Constitutional rights were not clearly established at the time of Defendants' alleged violations, as both the Supreme Court and the First Circuit have left unanswered what level of protection is accorded to individuals who have been arrested but are not yet pretrial detainees.

000038

Gen. Hosp., 463 U.S. 239, 244 (1983).  In Gaudreault, the First Circuit held that denial of medical care claims under the Fourteenth Amendment are analyzed under the "deliberate indifference" standard laid out under the Eighth Amendment. Gaudreault, 923 F.2d at 208 (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

As we previously explained, Defendants did not act deliberately indifferent to the decedent's medical needs before, during, and after the arrest.  Because Rojas-Miranda's injuries appear to be mostly superficial, the arresting officers exercised their judgment in determining that the most prudent course of action would be to treat the decedent at the police station.   The officers' concerns for protecting innocent bystanders weighed heavily against treating the decedent at an urgent care facility, given his violent and delusional behavior. As the officers' judgment call was reasonable under the circumstances, the Court finds that Plaintiffs failed to show a violation of the decedent's Constitutional rights under the Fourteenth Amendment.   Accordingly, the Court finds that **Defendants are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment Due Process claims.**

### C. STATE LAW CLAIMS

As no viable federal causes of actions remain, Plaintiffs' state law claims are hereby **DISMISSES WITHOUT PREJUDICE.**   "[A]

39

000039

district court has discretion to decline to exercise supplemental jurisdiction after dismissing 'all claims over which it ha[d] original jurisdiction.'" <u>Figueroa v. Alejandro</u>, 597 F.3d 423, 431 n.10 (1st Cir. 2010)(*quoting* 28 U.S.C. § 1367(c)(3)). *See* <u>Rodríguez v. Doral Mortgage Corp.</u>, 57 F.3d 1168, 1176 (1st Cir. 1995)(finding that dismissal of supplemental state actions without prejudice is appropriate where there is an "unfavorable disposition of a plaintiff's federal claims" before trial). Although "[i]n an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims," the usual case will point toward declining to exercise jurisdiction over the remaining state-law claims when the Court balances the factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity. <u>Id.</u> at 1176; *see also* <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988).

### IV. CONCLUSION

For the reasons elucidated in the instant *Opinion and Order*, the Court hereby **ADOPTS IN PART AND REJECTS IN PART** the Magistrate Judge's *Report and Recommendation* (Docket No. 190). Accordingly, Defendants' *Motion for Summary Judgment* (Docket No. 146) is hereby **GRANTED.** Hence, all of Plaintiffs' federal causes of action are hereby **DISMISSED WITH PREJUDICE** and all

state law claims are hereby **DISMISSED WITHOUT PREJUDICE.**

Judgment shall be entered accordingly.

      **IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2014.

                           S/ DANIEL R. DOMÍNGUEZ

                           DANIEL R. DOMÍNGUEZ
                           U.S. District Judge

000041